THE PEOPLE OF THE STATE OF NEW YORK ex rel. DONALD A. J. RAY, Relator, against WALTER B. MARTIN, as Warden of Attica State Prison, Respondent.

County Court, Wyoming County, April 11, 1944.

*Thomas J. McKenna* and *Benjamin Galperin* for relator.

*Nathaniel L. Goldstein, Attorney-General* (*Wortley B. Paul* and *Henry S. Manley* of counsel), for respondent.

*Beverly S. Galloway, Assistant District Attorney of Cattaraugus County.*

CONABLE, J.  The relator was indicted by a grand jury of the County of Cattaraugus for the crime of murder in the first degree alleged to have been committed September 16, 1939, in the city of Salamanca in said county.  He was convicted upon the second count of the indictment which charged a killing by the relator while engaged in the commission of a robbery.  Upon this conviction he is now confined in the Attica State Prison for life.  The relator is, and the deceased was, a white man.  The relator now claims in this proceeding that his imprisonment is illegal, that the judgment of conviction is void, that the crime was not cognizable by the laws of the State of New York but was solely within the jurisdiction of the Federal courts.  An appeal from the judgment of conviction was taken to the Appellate Division of the Supreme Court where it was affirmed.  An appeal to the Court of Appeals was dismissed.  (*People* v. *Ray,* 172 Misc. 1004, affd. 259 App. Div. 1065, appeal dismissed 282 N. Y. 680.)  Neither upon the trial

nor in the appellate courts was any question of jurisdiction raised.

The locus of the crime has never been in dispute. The question of jurisdiction is purely a legal one based upon facts undisputed in the record.

The relator petitioned for a writ of habeas corpus to the United States District Court for the Western District of New York. His petition was there denied upon an opinion of Honorable JOHN KNIGHT, United States District Judge, filed July 19, 1943 (*Ex Parte Ray*, 54 F. Supp. 218), upon the ground, first, that the petitioner could not invoke the jurisdiction of a Federal court upon a writ of habeas corpus until he should have exhausted his remedies in the State courts, citing *Jones* v. *Dowd* (128 F. 2d 331) and *Mooney* v. *Holohan* (294 U. S. 103). Secondly, Judge KNIGHT held that the penal laws of the State of New York governed the acts for which this relator was convicted and that the Supreme Court of the State of New York had jurisdiction to try and convict.

This decision was appealed to the Circuit Court of Appeals where it was affirmed (*sub nom. United States* v. *Martin*, 141 F. 2d 300, Judge JEROME FRANK writing the opinion of the court), upon the sole ground that the application was made prematurely since the petitioner had not exhausted his remedies in the State courts. The majority of the court refrained from expressing any opinion upon the issue as to whether the State court had jurisdiction, but Judge CLARK in an opinion concurred upon the additional and alternative ground that the New York Supreme Court had jurisdiction.

We have here a question which ultimately must be passed upon by the Federal courts. The statutes we are asked to construe are Federal statutes. Nearly all the authorities cited are decisions of Federal courts, but those courts seem to be inhibited from deciding the matter unless and until the State courts shall have proven that they " will not, or cannot do justice " (*United States* v. *Martin*, 141 F. 2d 300, 301, *supra*). The result is that the question is presented initially to this court.

In attempting to decide the issue before us we are indebted and accord great weight to the opinions expressed by United States District Judge KNIGHT and Judge CLARK of the United States Circuit Court of Appeals. The briefs furnished us by the respective counsel are most interesting as examples of research and learning along lines both legal and historical.

The question which we are to attempt to decide, as has been indicated, is whether the penal laws of the State of New York

as to a non-Indian charged with murder of another non-Indian, within the confines of the city of Salamanca, apply, or whether such a crime is solely within the purview of Federal law.

Chapter 11 of title 18 of the United States Code provides a complete system of penal statutes which by section 451, subdivision 3, are made to apply to " lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building."

Section 289 of the Federal Criminal Code (U. S. Code, tit. 18, § 468) adopts by reference the definitions of and punishments for acts not made penal by any act of Congress but defined and punished by the laws of the State in which such lands are located. Such acts in such territory are, nevertheless, crimes under Federal law and ordinarily to be prosecuted in the Federal courts. (*Puerto Rico* v. *Shell Co.*, 302 U. S. 253, 266, citing *United States* v. *Press Publishing Co.*, 219 U. S. 1; *Franklin* v. *United States*, 216 U. S. 599.)

Section 273 of said Criminal Code (U. S. Code, tit. 18, § 452) specifically defines as murder the acts of which this relator was convicted. It is not seriously contended that the city of Salamanca explicitly comes within this or the other subdivisions of said section.

Chapter 6 of title 25 of the United States Code (the section of the Code relating to Indians) defines and prescribes the punishment for certain crimes committed by white men and by Indians within the Indian country under certain conditions.

Section 217 of said chapter 6 provides as follows: " Except as to the crimes the punishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country."

The serious contention made by the relator here is that section 217 of said chapter 6 extends the provisions of section 273 of the Federal Criminal Code (U. S. Code, tit. 18, § 452) to a murder committed by one white man upon another within the city of Salamanca and that the city is " Indian country " under the meaning of said section 217. In claiming that the New York Supreme Court lacks jurisdiction he seems to rely upon certain language in the case of *Ex Parte Crow Dog* (109 U. S. 556) and similar cases, to the effect that all of the lands in the

United States to which the Indian titles have not been extinguished are "Indian lands". He relies particularly upon certain extracts from the opinion of Judge JEROME FRANK in *United States* v. *Forness* (125 F. 2d 928).

Section 8 of article I of the Federal Constitution gives the Congress power "to regulate Commerce with foreign Nations, and among the States, and with the Indian Tribes". To an increasing extent both the tribes and the individuals within the tribes have been regarded as the wards of the Federal Government. The power of Congress has been implied to extend, as to Indians, to crimes committed by them and against them and also to their dealings with non-Indians, whether within the eastern States where title was originally in the States or in the western States where title was originally in the United States. (See *People ex rel. Cusick* v. *Daley,* 212 N. Y. 183; *Ex Parte Crow Dog,* 109 U. S. 556, *supra; United States* v. *Kagama,* 118 U. S. 375; see, also, *United States* v. *McBratney,* 104 U. S. 621; *Draper* v. *United States,* 164 U. S. 240.) As illustrating the extent to which the Federal Government may impose its authority for the benefit of its wards, the Indians, even in territory adjacent to the reservations where the Indian title has been extinguished, reference is made to the case of *Browning* v. *United States* (6 F. 2d 801, certiorari denied 269 U. S. 568).

It seems clear that if the Congress has intended that the criminal laws of the United States shall extend over non-Indians in the city of Salamanca, its intention must prevail. From the spirit of statute and decisional law such extension would seem to be based less upon whether the title of the Indians to the territory involved may or may not have been completely extinguished, than whether the interests and welfare of the Indians as wards of the United States are involved.

It is argued that under the language of *Ex Parte Crow Dog* cited above, and other cases, the term "Indian country" as used in said statute applies to the Seneca Reservation, but the question to be decided here is more strictly limited.

If by the enactment of the Act of Congress of February 19, 1875 (18 U. S. Stat. 330), the Congress intended to permit extension of the criminal laws of the State of New York to the villages therein provided for, and to remove such villages from the category of "Indian country", then, for that purpose, said section 217 and chapter 11 of title 18 of the United States Criminal Code do not apply to non-Indians within the city of Salamanca.

Said Act of 1875 is set forth in the annotations to section 71 of the Indian Law in McKinney's Consolidated Laws of the State of New York.

It is evident that following the passage of this Act the surveys provided for were made, defining the limits of the villages, including Salamanca. Leases of a large part of the territory for twelve years were negotiated in 1880. Chapter 188 of the Laws of 1881 of the State of New York (amd. L. 1892, ch. 679, L. 1915, ch. 339), now in section 71 of the Indian Law of New York State, was passed. Later, the Congress by the Act of September 30, 1890 (26 U. S. Stat. 558), enacted that the leases might be renewed for a further term of ninety-nine years subject to all of the other terms and conditions of said Act of 1875. While this did not completely extinguish the Indian titles, it did seem to provide for non-Indian occupancy and control, probably permanent. The City of Salamanca was organized in 1913 and now substantially all of the land in the city is occupied under said ninety-nine-year leases, by non-Indians. The New York Legislature, passing said chapter 188 of the Laws of 1881 which referred to the Act of Congress of 1875, adopted much of the language of that Act but provided that " all the general laws of this state are extended over and shall apply to the same [said villages] ". Evidently this was the contemporaneous understanding of the New York Legislature as to the effect of the Act of Congress. The Supreme Court of the State of New York, the County Court of the County of Cattaraugus, the Justices of the Peace of the Town in which the former village of Salamanca was located, and, since the establishment of the City, the City Court, have all exercised criminal jurisdiction over non-Indians within the city of Salamanca. Over the past period of upwards of sixty years their jurisdiction seems not previously to have been questioned.

The case of *Ex Parte Crow Dog* (109 U. S. 556, *supra*) is not an authority here; that case involved the murder of an Indian by another Indian on a reservation.

The case of *United States* v. *Forness* (37 F. Supp. 337, revd. 125 F. 2d 928, certiorari denied *sub nom. City of Salamanca et al.* v. *United States,* 316 U. S. 694) was a suit brought to enforce cancellation of certain leases made by the Seneca Nation upon lands in the city of Salamanca where the lessees had persistently defaulted in paying the rentals. The issue decided by the case is that such controversies between the Indians, who are the peculiar wards of the Federal Government, and lessees of lands in the city leased pursuant to the Act of Congress, are

subject to the Federal laws and not to the laws of the State of New York. The crux of the decision is in the words: '' But state law cannot be invoked to limit the rights in lands granted by the United States to the Indians * * * state law does not apply to the Indians except so far as the United States has given its consent.'' (*United States* v. *Forness,* 125 F. 2d 928, 932, FRANK, J., *supra.*)

There are certain statements in Judge FRANK's opinion which the relator believes are favorable to his contention. These we will refer to later. We believe them to be obiter dicta. In the case before us, the murder of a white man by another white man in a city of white men, no consideration particularly affecting the interests or welfare of the Indians is involved. The sole question is whether the white inhabitants of the city of Salamanca are subject to the State or Federal criminal law and within the jurisdiction of the State or Federal courts. The question seems finally to be determined by the interpretation to be put upon the phrase '' and all municipal laws and regulations of said State may extend over and be in force within said villages ''. (Act of Feb. 19, 1875, ch. 90, § 8; 18 U. S. Stat. 330.) In interpreting this phrase it seems necessary, at the risk of seeming tedious, to analyze the spirit and purposes of said Act of Congress of 1875.

Section 1 of the Act validated leases formerly made to railroad companies. These leases we understand had been made by supposed authority of State statutes but had been held unauthorized. (See *Buffalo, Etc., R. Co.* v. *Lavery,* 75 Hun 396; *Ryan* v. *Knorr,* 19 Hun 540.) Here the State had attempted ineffectually to legislate concerning relations between white men and Indians (but see *State of New York* v. *Dibble,* 62 U. S. 366; *United States, Ex Rel.,* v. *Tyler,* 269 U. S. 13).

Section 2 authorized the appointment of commissioners to locate proper boundaries for Salamanca and other villages including as far as practicable '' all lands now occupied by white settlers and such other lands as, in their opinion, may be reasonably required for the purposes of such villages ''. The villages, then, were to be villages of white men and not Indians.

Section 3, in general, provided for the making of twelve-year leases (later legislation providing for ninety-nine-year leases) to be perpetually renewed as provided in the section by arbitration between the non-Indian lessees and the Indians as lessors.

Section 4 authorized the Seneca Nation to lease lands not belonging to individual Indians, to make such leases as might

be authorized by the resolution of its councilors in accordance with the laws and system of government of the Seneca Nation.

Section 5 provided for recording of the leases in the office of the Clerk of Cattaraugus County and made them subject to the recording laws of the State of New York. It provided that the rights of the lessees (non-Indians) should pass by assignment, will, descent or otherwise as provided by the laws of the State of New York, but that the rights of the Indians in such leases should descend as provided by the laws of the Seneca Nation. This section appropriately makes matters of concern to non-Indians subject to white men's law and matters of concern to Indians only, subject to Indian law. Potential conflicts between Indian lessors and the lessees involving forfeiture of leases and the like, are, since the Indians have a degree of sovereignty and are the wards of the Federal Government, *extramural* matters so far as the laws of the State of New York are concerned. Such matters are subject to the laws of the United States. (*Matter of Forness,* 125 F. 2d 928, *supra.*)

Section 7 of the statute attempts to give jurisdiction both to the courts of the State of New York and to the United States courts, probably as a matter of convenience, as to actions for rents, recovery of real property, etc., within the villages. This section is not inharmonious with the spirit of the whole statute as we interpret it. It perhaps was not then understood that, on account of the Federal guardianship of the Indians, a special body of law might develop as to leases made with them, and their enforcement, other than that prevailing generally in the locality where the lands were situated. The Congress could not have anticipated the *Forness* case, which pioneered the law in this regard some sixty-five years later.

Section 8 recognizes that highways extending through the villages and to other parts of the reservation are matters of concern both to the inhabitants of the village and to the Indians on the reservation outside the village. It provides that all the laws of the State of New York concerning highways and bridges shall apply within the villages and, with the consent of the Seneca Nation in council, may extend to and be in force beyond " said villages in said reservations, or in either of them ".

Hereafter occurs the phrase we have quoted above: " and all municipal laws and regulations of said State may extend over and be in force within said villages: *Provided, nevertheless,* That nothing in this section shall be construed to authorize the taxation of any Indian, or the property of any Indian not a citizen of the United States."

In determining the meaning of the phrase " all municipal laws and regulations of said State ", we are permitted to and should consider the purpose and spirit of the entire Act in which it occurs. We should ascribe to it a meaning in harmony with its context, not the meaning which gives it " the least possible sense " in that context.

The learned Assistant Attorney-General in his brief points out that in early texts, more generally read in 1875 than now, the term " municipal law " was often used as referring not merely to the laws relating to municipal corporations but to the laws generally of a State or nation applying to its internal affairs, contradistinctive to international law or laws having to do with extramural matters or relationships. He cites the following:

Blackstone's Commentaries with notes by T. M. Cooley (2d ed., Chicago, 1872, book 1, § 2, p. 43) : " Thus much I thought necessary to premise concerning the law of nature, the revealed law, and the law of nations, before I proceeded to treat more fully of the principal subject of this section, municipal or civil law; that is, the rule by which particular districts, communities or nations, are governed  *  *  *. I call it *municipal* law, in compliance with common speech; for, though strictly that expression denotes the particular customs of one single *municipium* or free town, yet it may with sufficient propriety be applied to any one state or nation, which is governed by the same laws and customs. Municipal law, thus understood, is properly defined to be ' a rule of civil conduct prescribed by the supreme power in a state, commanding what is right and prohibiting what is wrong.' "

Also, Kent's Commentaries (12th ed.), edited by O. W. Holmes, Jr., published in 1873 (Part III, p. 507) : " Municipal law is a rule of civil conduct, prescribed by the supreme power of a state.  *  *  *  Municipal law is composed of written and unwritten, or of statute and common law. Statute law is the express will of the legislature, rendered authentic by certain prescribed forms and solemnities."

Also Bouvier's Law Dictionary (Rawle's 3d Rev.) : " *Munic-ipal.* Strictly, this word applies only to what belongs to a city.  *  *  *  Among the Romans, cities were called *municipia;* these cities voluntarily joined the Roman republic in relation to their sovereignty only, retaining their laws, their liberties, and their magistrates, who were thence called *municipal magistrates.* With us this word has a more extensive meaning: for example, we call *municipal law,* not the law of a city only, but

the law of the state. 1 Bla. Com. 44. Municipal is used in contradistinction to international; thus, we say, an offense against the law of nations is an international offense, but one committed against a particular state or separate community is a municipal offense."

Also, "Lectures Introductory to the Study of Law" by George Sharswood, Philadelphia, 1870: "*Natural jurisprudence* includes in its survey topics which belong both to Municipal and International Law; that is, both the system of rules which governs a state internally, which we term *Municipal Law,* and that system by which it is regulated in the intercourse and relations with other states, which we call *International Law.*"

Also, "Introduction to American Law" by Professor Timothy Walker (6th ed., Boston 1874, p. 31): "The grand design of this government would be to unite the people of the *several states* into one nation for *national purposes* only; and accordingly for all *municipal purposes,* each State would still retain its former government, divested, however, of the attributes of complete national sovereignty * * *. Suffice it to say, that each citizen would now owe obedience to two distinct governments, one *national* and the other *municipal* * * *."

To these citations might be added the third definition of the word "municipal" as given in Webster's New International Dictionary (2d ed.): "3. Of or pertaining to the internal or governmental affairs of a state, kingdom, or nation; — used chiefly in the phrase ' municipal law '."

This view of the meaning of the statute was evidently presented to the Federal courts in the case of *United States* v. *Forness (supra).* It seems to us that it should be accorded greater consideration than it received there. In the District Court, Judge KNIGHT was of the opinion that the words municipal laws "were intended to apply only to the State laws for the government and control of villages." (*United States* v. *Forness,* 37 F. Supp. 337.) If the term were intended to be so limited, it does not seem that the statute is appropriately worded. In their restricted sense "all the municipal laws of the State of New York" would include not only the Village Law but the Town Law, and the County Law, and the General Municipal Law, as well as laws relating to cities and districts of various sorts. Prior to 1874 a great many villages had been set up under special acts of the Legislature. The site of the village of Salamanca was located within the county of Cattaraugus and also within the boundaries of the township of Salamanca as well as being part of the Indian reservation.

In the Circuit Court of Appeals, Judge FRANK dismissed the contention as follows (*United States* v. *Forness*, 125 F. 2d 928, 932, *supra*): " When, as in the statute, the ' laws ' of a state of the Union are under discussion, there can be no intelligent reference to its international or extra-mural laws, for it has none under our federal Constitution. Appellees' construction would, in effect, read the word ' municipal ' out of the statute. ' Municipal laws ' of such a state can have but one reference, i.e., the laws of its municipalities. The meaning is the same as when we speak of the ' Municipal Building ' of the City of New York."

However, as is stated on page 1413 of volume 42 of Corpus Juris, the adjective " municipal " is " more elastic in its meaning than the word ' municipality ' or even than the term ' municipal corporation ', variously defined as, belonging to a city, town, or place having the right of local government, belonging to or affecting a particular state or separate community \* \* \*. The term is sometimes used in contradistinction to ' international ' \* \* \*. It has a broader meaning, a more extensive or extended meaning; and is in legal effect the same as public or governmental as distinguished from private." (See, also, cases there cited.)

As to the statement that the State of New York can have no international or extramural laws, it would seem that in a sense a State may have and does have laws affected with an interest outside of the concerns of its own citizens and even outside its own boundaries. Then, too, the phrase is properly used in contradistinction to laws of the Federal Government which define relations of the State and its citizens under the Constitution, with other States of the Union and their citizens. We have seen that in 1836 New York State had legislated to authorize Indian leases to railroads, but that the courts had failed to uphold them. (*Ryan* v. *Knorr*, 19 Hun 540, *supra*.) The statute under consideration, even in its narrower sense, would permit State legislation governing certain relations with the Indians in whom a separate sovereignty is recognized. The statute is legislation which, passed by the State Legislature with the consent of Congress, would have an extramural significance.

It would seem to us that if the term " all municipal laws and regulations of said State " is to be limited narrowly to mean all of the village laws, or even all laws relating only to municipal corporations, the legislation would be inept and ineffectual to accomplish anything but an unworkable and confused result.

The Village Law of 1870 (L. 1870, ch. 291) provided for police and police justices within villages. The police justices were vested with the same jurisdiction in civil and criminal matters as justices of the peace. The Act further provided that the justices resident in a town where a village was located should have within the village the same civil and criminal jurisdiction which they might exercise outside the village. The question may be asked: " What criminal law was it intended these officers should administer? " Were village police and police justices to administer the village ordinances and the Federal laws? Where would appeals from the decisions of the police justices and the justices of peace be heard? The Town Law gave criminal jurisdiction to justices of the peace. The County Law provided for sheriffs. Federal law is administered by United States Commissioners and the Federal courts, and mandates are executed by United States marshals. Many questions of this sort suggest themselves. It does not seem likely that the Congress could have intended to pass a statute designed to effect legal chaos in the village or city of Salamanca.

On the other hand it seems that if the broader significance is to be given to the term " all municipal laws and regulations of said State ", the statute is understandable and workable. Such meaning seems in harmony with the general purpose and intention of the Act. Used in this sense the word " municipal " was most appropriate. If the word " municipal " were to be eliminated, the phrase would be appropriate no longer. It was not, as it seems, intended that *all the laws and regulations of the State* might extend over and be in force in said villages. If the statute had so read it would have been arguable that it authorized other laws, such as had been previously attempted, regulating relations with the Indians. It would have seemed to permit the State to invade a field intended to be reserved to the Federal Government as guardian of the Indian tribes.

If Congress intended, as we apprehend it did, to pass a statute establishing the villages of non-Indians on the reservation, permitting the laws of the State of New York to govern them so far as their own affairs were concerned, leaving matters purely Indian for regulation according to the institutions and customs of the Indians, but preserving to the Federal Government its rights and duties towards its wards, the Indians, where matters might arise affecting their welfare, we can think of no simple phrase which could have been used so aptly as the phrase " municipal laws and regulations ", understood in its broader sense.

The fact that in the year 1881, after this Act of Congress was passed and after the surveys had been filed and the leases made, the Legislature of the State of New York passed an act indicating an understanding that the general laws of the State of New York should apply to the villages in question, would seem to be an argument of some weight in favor of the interpretation we are adopting. The facts that for upwards of sixty years the State courts have assumed jurisdiction of criminal matters affecting white people in the city of Salamanca, and that during that period the Federal authorities have disclaimed and down to the present still disclaim jurisdiction, are also arguments that the interpretation suggested was intended by the Congress. As Judge KNIGHT has pointed out, in the construction of a statute of this kind the administrative view is entitled to great weight. He cites *United States* v. *Amer. Trucking Ass'ns.* (310 U. S. 534.)

Where a statute is susceptible of more than one interpretation, contemporaneous and long-continued administrative interpretation of it is especially persuasive. (See annotations, 73 L. ed. 322 and 84 L. ed. 28.)

We conclude that the Act of Congress of February 19, 1875, permitted the extension of the penal laws of the State of New York to crimes committed by non-Indians within the city of Salamanca, and that said city is not Indian country within the meaning of section 217 of chapter 6 of title 25 of the United States Code. The Supreme Court of the State of New York had jurisdiction to try and convict the relator and he is held by virtue of a judgment of a court of competent jurisdiction. An order should be entered dismissing the writ and remanding the relator to the custody of the Warden of Attica State Prison.