THE PEOPLE OF THE STATE OF NEW YORK ex rel. DONALD A. J. RAY, Appellant, against WALTER B. MARTIN, as Warden of Attica State Prison, Respondent.

Argued January 11, 1945; decided March 1, 1945.

*Thomas J. McKenna, James B. McKenna* and *Benjamin Galperin* for appellant. I. Relator if detained under a void commitment in violation of his constitutional rights under the Fourteenth Amendment, section 1, of the United States Constitution, is entitled to the remedy of habeas corpus. (Civ. Prac. Act, § 1230; *People ex rel. Sain* v. *Martin,* 289 N. Y. 471; *Hoff* v. *State of New York,* 279 N. Y. 490; *People ex rel. Carr* v. *Martin,* 286 N. Y. 27; *Hans Nielsen, Petitioner,* 131 U. S. 176; *Bowen* v. *Johnston,* 306 U. S. 19.) II. Treaties,

Federal and State legislation and judicial interpretations of such treaties and legislation establish that the Supreme Court of the State of New York did not have jurisdiction of this offense. III. The present city of Salamanca is part of the Allegany Reservation, which, with several others, was set aside by the United States pursuant to treaties for the Seneca Nation. Treaty of 1794 (7 U. S. Stat. 44); Treaty of 1838 (7 U. S. Stat. 550); Treaty of 1842 (7 U. S. Stat. 586); *New York Indians,* 5 Wall. 761; Cohen Handbook of Indian Law, 416, 424; *United States* v. *Forness,* 37 F. Supp. 337, 125 F. 2d 928; *City of Salamanca et al.* v. *United States,* 316 U. S. 694.) IV. Legis lation affecting the Reservation disclosed the inability of New York State to legislate therefor. (*Ryan* v. *Knorr,* 19 Hun 540; *United States* v. *Kagama,* 118 U. S. 375; *Whitney* v. *Robertson,* 124 U. S. 190; *Ex Parte Crow Dog,* 109 U. S. 556; *United States* v. *Soldana,* 246 U. S. 530; *United States* v. *Chavez,* 290 U. S. 357.) V. Judicial interpretations are in accord with appellant's position. (*Worcester* v. *The State of Georgia,* 6 Pet. [U. S.] 515; *The New York Indians,* 5 Wall. [U. S.] 771; *United States* v. *Forness,* 125 F. 2d 928, certiorari denied *sub nom. City of Salamanca et al.* v. *United States,* 316 U. S. 694; *Hamilton Shoe Co.* v. *Wolf Brothers,* 240 U. S. 251; *Pickett* v. *U. S.,* 216 U. S. 456; *Donnelly* v. *United States,* 228 U. S. 243.) VI. The opinion of the Appellate Division erroneously limited relator's reliance for relief solely to an interpretation of the words " Indian Country " as used in section 217 of title 25 of the U. S. Code, and then failed to follow prior decisions of the United States Supreme Court construing the term " Indian Country." (*United States* v. *Chavez,* 290 U. S. 357; *Donnelly* v. *United States,* 228 U. S. 243; *Puerto Rico* v. *Shell Co.,* 302 U. S. 253; *United States* v. *Press Publishing Co.,* 219 U. S. 1; *Franklin* v. *United States,* 216 U. S. 559.)

*Nathaniel L. Goldstein, Attorney-General* (*Henry S. Manley, Orrin G. Judd* and *Wortley B. Paul* of counsel), for respondent. I. There is doubt whether the ultimate question involved can be reached in this habeas corpus proceeding. (*People ex rel. Carr* v. *Martin,* 286 N. Y. 27; *Davis* v. *Johnston,* 144 F. 2d 862.) II. The Indian Law, section 71, insofar as it provides that " all the general laws of the State " extend over and

apply to Salamanca, is not inconsistent with the Constitution of the United States, particularly article I, section 8, clause 3, or with any treaty entered into or acts enacted thereunder. (*Seneca Nation* v. *Christie*, 126 N. Y. 122, 162 U. S. 283; *United States* v. *Franklin County*, 50 F. Supp. 152; *United States* v. *National Gypsum Co.*, 141 F. 2d 859; *Fellows* v. *Blacksmith et al.*, 19 How. [U. S.] 366; *State of New York* v. *Dibble*, 21 How. [U. S.] 366; *United States ex rel. Tyler*, 269 U. S. 13; *Worcester* v. *The State of Georgia*, 6 Pet. [U. S.] 515; *United States* v. *Bailey*, 1 McLean 234; *Wood* v. *City of Salamanca*, 289 N. Y. 279.)  III. There is no inconsistency between the asserted State jurisdiction and the seventh article of the 1794 Treaty of Canandaigua.  IV. Section 71 of the Indian Law is constitutional even without authorization by Congress.  (*United States* v. *Holliday*, 70 U. S. 407; *Hanley* v. *Kansas City Southern Ry. Co.*, 187 U. S. 617; *Surplus Trading Co.* v. *Cook*, 281 U. S. 647; *United States* v. *McGowan*, 302 U. S. 535.)  V. However, Indian Law, section 71, is authorized by Congress in the 1875 Act.  VI. Salamanca is not " Indian Country " and hence U. S. Code, title 25, section 217, does not render U. S. Code, title 18, sections 451 and 452, applicable.  (*Surplus Trading Co.* v. *Cook*, 281 U. S. 647; *James* v. *Dravo Contracting Co.*, 302 U. S. 134; *Ex Parte Crow Dog*, 109 U. S. 556; *United States* v. *Kagama*, 118 U. S. 375; *Donnelly* v. *United States*, 228 U. S. 243; *People ex rel. Cusick* v. *Daly*, 212 N. Y. 183; *Benson* v. *United States*, 44 F. 178; *Bates* v. *Clark*, 95 U. S. 204; *United States* v. *Le Bris*, 121 U. S. 278; *Clairmont* v. *United States*, 225 U. S. 551.)

*Beverly S. Galloway, Assistant District Attorney, Cattaraugus County.*  I. The sovereignty of the State of New York attaches to the lands of the Seneca Indians comprised within the boundaries of the State of New York.  (*Johnson* v. *M'Intosh*, 8 Wheat. [U. S.] 543; *Harcourt* v. *Gaillard*, 12 Wheat. [U. S.] 523; *Clark et al.* v. *Smith*, 13 Pet. [U. S.] 195; *Fletcher* v. *Peck*, 6 Cranch [U. S.] 87; *Worchester* v. *The State of Georgia*, 6 Pet. [U. S.] 515.)  II. New York having exercised her sovereign power within the Seneca Reservation, with the acquiescence of the Indians and the Federal government, jurisdiction of the United States over lands of the Seneca Indians is not exclusive.

(*People ex rel. Cusick* v. *Daley,* 212 N. Y. 183; *Benson* v. *United States,* 44 F. 178; *Ex Parte Crow Dog,* 109 U. S. 556; *State of New York* v. *Dibble,* 21 How. [U. S.] 366; *Seneca Nation* v. *Christie,* 126 N. Y. 122; *Hatch* v. *Luckman,* 155 App. Div. 765; *Jimeson* v. *Pierce,* 78 App. Div. 9; *United States* v. *Waldow,* 294 F. 111; *United States* v. *McBratney,* 104 U. S. 621.) III. The writ of habeas corpus cannot be made use of as a writ of error. (*United States* v. *Waldow,* 294 F. 111; *Robb* v. *Connolly,* 111 U. S. 624; *Ex Parte Royall,* 117 U. S. 241; *Eaton* v. *State of West Virginia,* 91 F. 760.)

DESMOND, J.   Relator is serving, in a New York State prison, a life sentence imposed on him by the Supreme Court of the State of New York on December 15, 1939, for the commission, at the city of Salamanca, in Cattaraugus County, New York, of a " felony murder " (Penal Law, § 1044, subd. 2; § 1045a). Almost the whole of the city of Salamanca, including the scene of the killing, is within the bounds of the Allegany Reservation of the Seneca Nation of Indians. Relator is not an Indian, nor was his victim, one Paul Balsiger. In this habeas corpus proceeding relator asserts that the Supreme Court of this State was without any jurisdiction of his offense, committed as it was on an Indian reservation. No such challenge to the jurisdiction was made during relator's trial or on his appeal to the Appellate Division from the judgment of conviction, which appeal resulted in an affirmance by that court (259 App. Div. 1065); or on a subsequent motion, denied by a Judge of this court, for leave to appeal to this court. We hold, nonetheless, that the alleged jurisdictional question may properly be raised by these habeas corpus proceedings. (See *People ex rel. Carr* v. *Martin,* 286 N. Y. 27, 31, 32.) The County Judge and the Appellate Division, fourth department, both wrote opinions (181 Misc. 925 and 268 App. Div. 218) in dismissing the writ. We granted leave so that we might, if possible, set at rest any doubts as to whether the penal laws of this State apply to crimes committed in the city of Salamanca. The respective counsel have furnished us with extensive reviews of the writings on the very large subject of the jurisdiction of tribal, Federal and State courts over Indian reservations in the United States. We content ourselves with a statement of the bases for our conclusion that relator was properly indicted, tried and punished in the Supreme Court, despite the undoubted

fact that the crime was committed on lands which form part of an Indian reservation. In general, our reasons for that conclusion are these: that there is no basis in any treaty, constitution or statute for an assertion by the Federal Government of exclusive jurisdiction over crimes committed by non-Indians against non-Indians on this reservation, that such jurisdiction has historically, by common consent and for sound legal reasons been assumed to exist, by the Federal and State courts in New York and elsewhere, that this is peculiarly so as to the reservations of the " Six Nations " in New York State, and, finally, that there is a Federal statute making applicable to the city of Salamanca the general laws of the State of New York.

The Allegany Reservation of the Seneca Indians is wholly within New York State, has an area of about forty-two square miles and extends along both sides of the Allegany River, north from the Pennsylvania border. It is a part of the much more extensive lands occupied by the Seneca nation before the American Revolution. Before our Federal Constitution was adopted, those Seneca lands were within the bounds of the State of New York. The Allegany Reservation was, accordingly, not created by the Federal Government out of United States Government lands within the State, and was never at any time territory of the United States. (*Seneca Nation* v. *Christie*, 126 N. Y. 122, 136, affd. 162 U. S. 283.) During colonial days there had been a protracted quarrel between New York and Massachusetts over a large territory (several million acres) including much of present-day Western New York, each colony claiming that its royal charter gave it sovereignty and jurisdiction over the disputed tract. In 1786, after the Declaration of Independence but before the adoption of the Federal Constitution, a compact was entered into between the sovereign States of Massachusetts and New York by the terms of which compact New York was recognized as having sovereignty and jurisdiction over the lands and Massachusetts was recognized as the owner of the " right of preemption " of the lands themselves, including the right to extinguish such title as the Indians had. This compact, subsequently ratified by the Congress of the United States, authorized Massachusetts to grant and convey the right of pre-emption, as to any part of the lands involved, " to any person or persons who by virtue of such grant shall have good right to extinguish

by purchase the claims of the native Indians * * * ".
Massachusetts in 1791 conveyed its title, subject to the Indian claims, to Robert Morris, who later conveyed it to the Holland Land Company, Morris agreeing to extinguish the Indian rights at his own expense. He did so in 1797 when at a great council of the Senecas held at Geneseo, New York, he received from the Seneca Nation a conveyance of all the lands purchased by him from the State of Massachusetts, excepting certain Indian reservations, including the Allegany Reservation with which we are here concerned. The council was held and the conveyance made with the approval of the Government of the United States, as represented by its Commissioner. (See discussions of these transactions in *Seneca Nation* v. *Christie, supra,* and *Jemison* v. *Bell Telephone Co.,* 186 N. Y. 493, 497.)

Previous to the Geneseo Council, and in 1794, there had been entered into at Kon-on-daigua (Canandaigua, N. Y.) a treaty between the United States of America and "the Tribes of Indians called the Six Nations" (including the Seneca Nation). By it " peace and friendship " were to be " firmly established " forever, between the United States and the Six Nations. (7 U. S. Stat. 44.) The treaty contains a description by metes and bounds of the lands of the Seneca Nation, with an acknowledgment by the United States that the described lands were the property of that Nation, and a promise by our Government that the possession thereof by the Senecas would never be disturbed. The Senecas, on their part, covenanted that they would never claim any other lands within the boundaries of the United States. By article V the Senecas ceded to the United States the right to build a wagon road through part of their lands (not the Allegany Reservation) and the right of free passage through all the Seneca lands. Article VII of that Treaty of 1794 is one of relator's main reliances. By that article it was stipulated that, " lest the firm peace and friendship now established should be interrupted by the misconduct of individuals, * * * for injuries done by individuals on either side, no private revenge or retaliation shall take place; but, instead thereof, complaint shall be made by the party injured, to the other ". If the depredation was by Indians, the complaint was to be made by the President, or a superintendent by him appointed, to the principal chiefs of the Six

Nations or any of them; if the " private injury " was by whites, then the complaint would go from the Indian Nation to the President, or his superintendent. Upon the entry of any such complaint, says article VII, " such prudent measures shall then be pursued as shall be necessary to preserve our peace and friendship unbroken; until the legislature (or great council) of the United States shall make other equitable provision for the purpose ". Relator treats that last-quoted sentence as " provision * * * for future federal legislation which would cover the crime in question when committed within the Allegany Reservation ". He says that the language " expressly excluded State laws from application to this Reservation ". We cannot agree that it had any such meaning or effect, or that it referred at all to the question of what system of internal law should thereafter operate within the tribal lands. The Treaty was, in substance as well as form, a true treaty, made between the United States of America and the quasi-sovereign Six Nations. It was made not to set off lands to the Indians or to provide for their government, but as a treaty of peace to put an end to a state of war and guard against its recurrence. For this purpose, border raids or other incursions were to be treated as " international incidents ", and diplomatic representations thereupon were to be made by the aggrieved signatory to the other. The Treaty of 1794 was one of a long series of actual treaties made between the United States and Indian tribes until the practice was abolished in 1871. (See *Seneca Nation* v. *Christie, supra; James Turner* v. *The American Baptist Missionary Union,* 5 McLean 344, 349; *U. S.* v. *43 Gallons of Whiskey, etc.,* 93 U. S. 188.) It did not create any Indian reservation but confirmed the Senecas' aboriginal right of possession. (See *U. S.* v. *Santa Fe, Pacific R. Co.,* 314 U. S. 339.) Nothing in the language of the pact, the circumstances giving rise to it, or the history of proceedings under it, furnish reason for holding that it had anything to do with the future domestic government of the Reservation or that the reference to " the legislature (or great council) of the United States " in itself conferred on Congress any power of any sort to legislate as to such matters. If such a meaning had been intended, appropriate language was available. (See, for instance, treaty provision quoted in *U. S.* v. *43 Gallons of Whiskey, etc., supra,* at p. 193.)

Of course, Congress had, from other sources, jurisdiction over the Indians and their lands and their affairs. By Federal Constitutional provision (art. 1, § 8) and perhaps *ex necessitate* (see *Board of Comm'rs* v. *Seber*, 318 U. S. 705, 715), the Indian tribes have always been to some degree dependents of the Government of the United States and their members have been wards of that Government, receiving its care and protection. (*U. S.* v. *Kagama*, 118 U. S. 375; *United States* v. *Sandoval*, 231 U. S. 28; *U. S.* v. *Klamath Indians*, 304 U. S. 119.) The power of Congress over the Indians and their tribal affairs and domains is paramount and of a most sweeping character. (*Worcester* v. *The State of Georgia*, 31 U. S. 515.) The courts of this State, as well as the Federal courts, have consistently recognized that this paramount power in Congress is applicable to the affairs of the Six Nations within New York State. (*People ex rel. Cusick* v. *Daly*, 212 N. Y. 183, 196; *Mulkins* v. *Snow*, 232 N. Y. 47, 51; *Kennedy* v. *Becker*, 241 U. S. 556, affg. 215 N. Y. 42.) But, while the tribal Indians, being wards of the National Government, are not generally amenable to State laws nevertheless the lands in any State occupied by Indians is still part of the State unless expressly excluded therefrom. (See *Thomas* v. *Gay*, 169 U. S. 264, 274, 275; *Utah & Northern Railway* v. *Fisher*, 116 U. S. 28.) The exclusive control of the Federal Government over Indians extends only so far as is required by the pupilage of the wards and has to do only with government and protection of the Indians themselves. (*Utah & Northern Railway* v. *Fisher, supra.*) Congress may exercise that jurisdiction by legislating concerning crimes committed by Indians or against Indians within a reservation. (*Donnelly* v. *United States*, 228 U. S. 243.) But that jurisdiction over the Indians has nothing at all to do with the transactions of white men among themselves not affecting the persons or property of Indians, on or off a reservation. Accordingly, it has been held in many State and Federal decisions, and apparently never until now questioned, that to oust the criminal courts of a State from jurisdiction over crimes committed by a non-Indian against a non-Indian, more must be shown than the single fact that the crime was committed on an Indian reservation. (See *Donnelly* v. *United States, supra*; *United States* v. *McBratney*, 104 U. S. 621; *State* v. *Monroe*, 83 Mont. 556; *People* v. *Pratt*, 26 Cal.

App. 2d 618; *State* v. *Lindsey,* 133 Wash. 140; *State* v. *Adams,* 213 N. C. 243; *United States* v. *Partello,* 48 F. 670.) To allocate jurisdiction over such crimes to the Federal courts, there must be shown some treaty or act specifically so commanding. (*United States* v. *Partello, supra;* see *Draper* v. *United States,* 164 U. S. 240.) The reason is simply this: the original thirteen States and those later admitted into the Union on an equal basis with the original thirteen, have general criminal jurisdiction over all non-Indian persons within the State limits, including Indian reservations. (*United States* v. *McBratney, supra.*) Even as to Indians, the National Government's exclusive jurisdiction of the crimes over which it has by statute assumed jurisdiction, applies only to Indians living " in their tribal relations " (*The Case of Peters, an Indian,* 2 Johns. Cas. 344; *People ex rel. Cusick* v. *Daly, supra,* 212 N. Y. 183, at p. 193). It is a jurisdiction stemming from the power to legislate in " Indian affairs " and not embracing all occurrences on Indian lands. The case of *The New York Indians* (5 Wall. [U. S.] 761), is not to the contrary; it forbade State taxation of tribal lands on this reservation because such taxation would be " offensive to their tribal relations " (p. 771). Cases like *Pickett* v. *United States* (216 U. S. 456), merely show that in the later-admitted States the Federal Government may, and sometimes did, in granting statehood, or in creating Indian reservations out of lands owned by the United States, expressly reserve exclusive jurisdiction on such Indian lands, as to all justiciable matters. No such situation has ever existed in New York State. In 1834, Supreme Court Justice McLean held at Circuit (*The United States* v. *Bailey,* 1 McLean 234) that a United States court could not try a white man for killing another white man on a Cherokee reservation. " The state of New York," he noted (p. 239) " for many years, has punished its citizens for crimes committed in the Indian territory within its limits ".

Assuming that Congress could by statute take or keep for itself exclusive legislative control over the crime of murder, by whomever perpetrated, in the Allegany Reservation, where is there any such statute? Relator relies on United States Code, title 18, §§ 451 and 452, and United States Code, title 25, § 217. The first two of those sections (U. S. Code, tit. 18, §§ 451, 452), so far as important here, define, and provide for the

punishment of murders " committed within or on any lands
* * * under the exclusive or concurrent jurisdiction [of the
United States] ". We find no ground whatever for a hold-
ing that the Allegany Reservation was ever " under the exclu-
sive or concurrent jurisdiction " of our Federal Government.
Ultimately, relator's opposing argument stands or falls on his
own construction of the Treaty of 1794, a construction which
we have rejected in preceding paragraphs of this opinion
and which has never in practice been accepted by any branch
of either the New York State or the United States Govern-
ments. In the other statute (U. S. Code, tit. 25, § 217) urged
upon us by relator as empowering the United States courts
alone to deal with murders done on reservations, the language
is that, with exceptions not here relevant, " the general laws
of the United States as to the punishment of crimes committed
in any place within the sole and exclusive jurisdiction of the
United States * * * shall extend to the Indian country."
Relator says that the Allegany Reservation, including the city
of Salamanca, is " Indian country." Without passing squarely
on the point, we conclude that there is some basis for it.
" Indian country ", archaic as the phrase now sounds, still
seems to comprehend any unceded land, such as a reservation,
occupied by an Indian tribe — any place to which the Indian title
has not been extinguished. (*Donnelly* v. *United States, supra*;
*Bates* v. *Clark*, 95 U. S. 204; *Ex parte Crow Dog*, 109 U. S. 556;
*Pronovost* v. *United States*, 232 U. S. 487; *United States* v. *Peli-
can*, 232 U. S. 442; *United States* v. *Chavez*, 290 U. S. 357.) We
may doubt whether the phrase " Indian country " ever did have
any meaning in connection with the Six Nations and more doubt
as to whether it could, in any event, be reasonably applied to
Salamanca, in which live only a handful of Indians and which
is, by State statute and Act of Congress (as we shall see here-
after), a white man's city. Only by main force, we think, could
the term be applied to a city all of the lands of which have, by
corporate action of the Seneca Nation and with the express con-
sent of Congress (see later discussion of the Act of 1875) been
leased to white persons. " A country without Indians, could
hardly be considered an Indian country " (*United States* v.
*Bichard & Co.*, 1 Ariz. 31, 39, 40). But, whether or not Salamanca
is still " Indian country " in some sense or other, we state with

confidence that the particular statutes cited by relator have never been considered as giving the Federal courts absolutely exclusive jurisdiction of crimes, whether committed by Indians or whites, on the New York State reservations. In *Benson* v. *United States* (44 Fed. 178), the Circuit Court, reversing a conviction, held that Benson, operating a tavern in Salamanca, was not guilty of introducing intoxicating liquors into the "Indian country" (see U. S. Code, tit. 25, § 241).

In *Mulkins* v. *Snow* (232 N. Y. 47, 50, 51), this court recognized, but did not define the limits of, the power of the State to legislate even in some respects "for the tribal Indians living on reservations" and referred to power of Congress as being one "to legislate for them [the Indians] within their reservation." The Supreme Court, in *State of New York* v. *Dibble* (62 U. S. 366, 370), referring to a New York State statute relating to intrusions of white men on Indian lands, and speaking specifically of the Tonawanda Reservation of the Senecas, said: "Notwithstanding the peculiar relation which these Indian nations hold to the Government of the United States, the State of New York had the power of a sovereign over their persons and property, so far as it was necessary to preserve the peace of the Commonwealth, and protect these feeble and helpless bands from imposition and intrusion. The power of a state to make such regulations to preserve the peace of the community is absolute, and has never been surrendered." It would take too long to list the various assumptions by New York State of various kinds of control over the Indians themselves, and the ratifications and recognitions thereof by the Federal Government and courts. (See *United States ex rel. Kennedy* v. *Tyler, supra*.) Justice ANDREWS, later of this court, wrote in a memorable opinion (*George* v. *Pierce*, 85 Misc. 105. 122): "Our courts have assumed criminal jurisdiction over them [the Six Nations]. Our legislature has asserted their right so to do. And this jurisdiction has been mentioned by the Supreme Court of the United States without disapproval." Justice ANDREWS, recalling that the Indians of the Six Nations were in fact wards of this State at the time it became an independent sovereignty on the adoption of the Declaration of Independence and that among other sovereign rights of the State, as successor to the British Crown before the adoption of the Con-

stitution, was its protectorate over the Indian tribes, pointed out that New York never transferred to the general government any rights over the Indians except as expressed in the Federal Constitution, and that, in a broad sense, the Indians of the Six Nations are, unlike the Western Indians " wards of the state — not of the United States " (85 Misc. at p. 120). From all of this, it is plain enough, we think, that the doubts and vagueness that becloud the general subject of law on Indian reservations, have nothing whatever to do with criminal prosecutions like that of this relator for the killing of Paul Balsiger, in Salamanca, New York, in 1939.

In an earlier paragraph of this opinion we stated, as one of the bases for our conclusion herein, that there is a Federal statute which makes applicable to the city of Salamanca, the general laws of the State of New York. That enactment (18 U. S. Stat. 330, ch. 90) was passed by Congress in 1875. It provides (§ 8) as to Salamanca (then a village) and several other named villages in the Allegany Reservation that " all municipal laws and regulations of said State [New York] may extend over and be in force within said villages ". From the historical background of the statute, the setting of the quoted language therein, and from subsequent authoritative interpretation given it by the New York Legislature, it is plain to us that " all municipal laws and regulations of said State " means all the internal, domestic laws of the State. Our arrival at that conclusion has not been a hasty or incautious one, conscious as we are that the United States Circuit Court of Appeals has, in *United States* v. *Forness* (125 F. 2d 928, certiorari denied, *sub nom. City of Salamanca* v. *United States,* 316 U. S. 694) interpreted somewhat differently the phrase of the statute: " municipal laws ". As always, we give due and great respect to the construction by a Federal court of a Federal statute, but we are not strictly bound in such matters by any but United States Supreme Court decisions. In this instance we feel constrained to make our own independent decision. We are called upon in this case to decide whether or not there exists any legal basis for the undisputed enforcement in Salamanca, for the past sixty-five years or more, of the general penal laws of this State. The Circuit Court of Appeals did not have any such broad question before it in the *Forness* case. The *Forness* case

was brought on behalf of the Seneca Nation, in ejectment, to oust one of the white lessees for nonpayment of the rent due from him to the Nation. One of the issues before the Circuit Court was as to the applicability to such a lawsuit between the tribe and a white individual, of sections 997–999 of the New York Civil Practice Act, particularly section 999 which permits payment into court, at any time before judgment, of the rent due, with costs, and requires a dismissal of the action, on such payments being made. Whatever the words "municipal law" may mean in the case we have before us on this appeal, or in other connections, it is entirely clear that Congress, validating the Indian leases and reserving a measure of Federal control over the leased lands, could not have intended by the 1875 statute to make applicable to controversies over those leases the New York laws as to remedies of the lessor on a default by the lessee. As the County Judge wrote in the present case, interpreting section 5 of the 1875 statute: "Potential conflicts between Indian lessors and the lessees involving forfeiture of leases and the like, are, since the Indians have a degree of sovereignty and are the wards of the Federal Government, *extramural* matters so far as the laws of the State of New York are concerned. Such matters are subject to the laws of the United States". (181 Misc. 925, 932.)

We agree with the Circuit Court of Appeals that "municipal laws" has two meanings. Broadly and classically it means the laws pertaining to the internal government of a State or nation. (See 1 Blackstone Comm. 44; *People* v. *Tiphaine*, 3 Parker Cr. Rep. 241, 244.) In its more modern and narrower connotation it means those laws which pertain to towns, cities and villages and their local governments. Intrinsically the words may have either of those meanings. But historical research, we believe, establishes that the broader and older intendment must have been the one used by Congress. The statute was passed because of a pressing difficulty. Long before 1875, Salamanca and several other villages of white men had sprung up on the Allegany Reservation, and the white settlers and several railroad companies who built their lines through the Reservation lands, had made their improvements on the faith of land leases from the Indians. Although confirmed by act of the New York Legislature, those leases were declared invalid

by the New York courts.  (See *Ryan* v. *Knorr*, 19 Hun 540.)
Thereupon the Legislature of this State passed and transmitted
to Congress a resolution (L. 1875, p. 819) requesting the latter
body to pass some law " for the relief of said white settlers."
Soon thereafter, Congress on February 19, 1875, enacted the
law we are here construing.  After providing for appropriate
validation of the leases, the statute in its last paragraph, says
this: " That all laws of the State of New York now in force
concerning the laying out, altering, discontinuing, and repair-
ing highways and bridges shall be in force within said villages
[including Salamanca], and may, with the consent of said
Seneca Nation in council, extend to, and be in force beyond,
said villages in said reservations, or in either of them; and
all municipal laws and regulations of said State may extend
over and be in force within said villages: Provided, *neverthe-
less*, That nothing in this section shall be construed to authorize
the taxation of any Indian, or the property of any Indian not
a citizen of the United States."  The best possible clue to the
meaning of " all municipal laws and regulations of the State "
as used in the Act is found in the action taken by our State
Legislature, after Congress had acceded to its request by
passing the statute above described.  Apparently the new
leases authorized by the Federal Act were entered into in
1880.  In 1881, our Legislature, undoubtedly as a sequel to
that passage of the Federal Act, put on our statute books
chapter 188 of the Laws of that year, now section 71 of our
State Indian Law, wherein, changing the word " municipal "
to " general " it directed that " all the general laws of this
state are extended over and shall apply to the same [the villages
of Salamanca et al.] ".  From that day until the *Forness* case
(*supra*) was decided, no one has ever expressed a doubt, as
far as any record shows, that the word " municipal " as used
by Congress and the word " general " as used by our Legis-
lature, meant exactly the same thing, and that both words
included and envisaged the whole State system of laws for the
internal government of the residents of the villages, and not
merely minor local ordinances, or State laws dealing with the
details of village government.  Such a use of the phrase
" municipal law " was technically and scientifically correct for
the result intended.  The Act of 1875 was an act of cession

in the sense that it ceded to the State such governmental juris-
diction as the National Government or the Seneca Nation might
otherwise have or been thought to have, over the white villages.
(Incidentally such cessions or relinquishments of Federal con-
trol over the government of Indian lands are not unusual and
are considered legal even in contravention of treaties, see
*Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 566, 567; *Tiger* v.
*Western Investment Co.*, 221 U. S. 286, 315; *Shoshone Tribe*
v. *U. S.*, 299 U. S. 476, 497.) To describe the body of law
which was to be operative in such ceded territory, the phrase
" municipal laws " was appropriate and conventional. In
*Chicago & Pacific Railway Co.* v. *McGlinn* [1885] (114 U. S.
542), the Supreme Court was called upon to decide whether
a State statute remained in effect on the Fort Leavenworth
Military Reservation after the State of Kansas had ceded
to the United States exclusive jurisdiction therein. A quota-
tion from that opinion (p. 546) will show better than extended
argument how apt and necessary was the phrase " municipal
laws " to convey the idea that in the village of Salamanca,
private property and private conduct were to be regulated
by the laws of the State of New York: " It is a general
rule of public law, recognized and acted upon by the United
States, that whenever political jurisdiction and legislative
power over any territory are transferred from one nation
or sovereign to another, the municipal laws of the country,
that is, laws which are intended for the protection of private
rights, continue in force until abrogated or changed by the
new government or sovereign." (For similar uses of the
word " municipal " see Halleck, Int. Law [1st ed., 1861], ch. 33,
§ 14; *Vilas* v. *Manila*, 220 U. S. 345, 347; *Murray* v. *Gerrick
& Co.*, 291 U. S. 315, 319.) Thus we see that the clause " all
municipal laws and regulations of said State may extend over
and be in force within said villages " was a short but scien-
tifically complete way of eliminating any doubt as to whether,
after the Act's passage, the laws affecting private rights of
the residents of the villages would be those of the United
States, or the Seneca Indians, or the State of New York. The
Circuit Court of Appeals thought that giving " municipal
laws " its more ancient meaning, i.e., of general State laws as
opposed to international laws, would result in an absurdity

since, said that court, the State of New York had no international relations or international law. But the villages and their villagers did have and continued to have a relationship, based on their leases, with the still quasi-independent Seneca Nation.

Relator argues that the specific reference in the above quoted 1875 Congressional statute to State laws concerning highways and bridges shows that the later-used term " municipal laws " had no application to State laws. On the contrary, we think that the statute itself shows why the highway and bridge laws were separately mentioned, i.e., because the Seneca nation in council was to have the right to extend those laws to the whole reservation.

The order should be affirmed.

LEHMAN, Ch. J., LOUGHRAN, LEWIS, CONWAY, THACHER and DYE, JJ., concur.

Order affirmed.