STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
RICHARD THEODORE COLEMAN, DEFENDANT-APPEL-
LANT.

Argued September 14, 1965—Decided November 8, 1965.

20

*Mr. William J. Rokos, Jr.* argued the cause for the appellant.

*Mr. Dominick A. Mirabelli,* Assistant Prosecutor, argued the cause for the respondent (*Mr. Leo Kaplowitz,* Union County Prosecutor, attorney).

The opinion of the court was delivered by

JACOBS, J. The Union County Grand Jury returned indictment No. 405 against the defendant Richard Theodore Coleman for the murder of his wife Millie Coleman and indictment No. 406 against him for the murder of his sister-in-law Ruby Coleman. The indictments were consolidated for trial. At the trial, the State's evidence of the two killings was not disputed. The defendant relied upon the defense of insanity as to both. The jury returned a verdict on indictment No. 405 of guilty of murder in the first degree with a recommendation of life imprisonment and on indictment No. 406 of not guilty by reason of insanity, said insanity continuing to the present time. The defendant appealed as of right to this Court from his conviction under indictment No. 405.

The defendant lived with his family in one-half of a two-family duplex at 1119 McCandless Street, Linden. His brother Harry and Harry's wife Ruby, lived in the other half of the duplex. During the evening of July 4, 1963 the defendant's wife Millie took their children to a relative's home in Rahway where Millie and the children spent the night. They returned to their home in Linden at about 3 P. M. on July 5th. In the meantime the defendant had done some drinking at a local tavern and had traveled to Elizabeth with friends. When he returned to his home during the afternoon of July 5th he found his wife preparing to leave with the children for Florida. There was an argument and the defendant shot and killed his wife.

Harry heard the argument and the shot, rushed from his apartment to that of his brother and saw Millie on the floor with "a lot of blood around her head." He called to his brother, received no answer, and then saw his brother coming up from the cellar with "a revolver in each hand." Harry asked his brother what he had done but there was no reply. The defendant then shot Harry. Wounded, Harry ran out of the back door of the defendant's apartment and to his own apartment, falling in as his wife Ruby opened the door. The defendant followed and shot point blank at Ruby, killing her.

The defendant then returned to his own apartment, came out, crossed the street and shot and wounded Mrs. Mary Ann Kube who was visiting in her mother-in-law's home on McCandless Street. He then entered his car, drove a short distance, and shot and wounded a neighbor, Leroy Edwards. He drove off and was finally apprehended at approximately 3:30 A. M. on July 6th as he was riding along Route 1 in Newark. He was taken to Newark Police Headquarters and at about 4 A. M. Linden police officers arrived there and spoke to him. He identified himself to them as Richard Coleman and admitted that he had shot his wife and his sister-in-law. At about 9:30 A. M. he was examined by a physician of the Newark Police Department, was brought before a Newark magistrate, and was then taken to Linden Police Headquarters where he was questioned for a short time.

The defendant was placed in a cell at 12:30 P. M. and shortly after 1 P. M. was taken to Masterpeter's funeral home where he identified the bodies of his wife and sister-in-law. He remained there briefly and was then returned to his cell. He was examined by a physician of the Linden Police Department at 3:15 P. M. and Reverend Schell, who had been called at the defendant's request, arrived at 3:35 P. M. During the evening of July 6th the defendant said that he wanted to make a statement but that he would like Reverend Schell to be present. Reverend Schell was called again and arrived at about 9 P. M. in the company of Mr. Patterson, a trustee of Reverend Schell's church. Between 9:25 P. M. and 11 P. M.

the defendant gave his statement in the presence of Reverend Schell, Mr. Patterson and several police officers.

At the trial, the killings and the attendant circumstances were overwhelmingly established by the State's evidence which included, *inter alia,* testimony from the defendant's daughter who saw Millie lying on the floor and the defendant with a gun in his hand, and testimony from the defendant's brother who, after seeing Millie on the floor and the defendant with guns in both hands, later saw the defendant shoot and kill Ruby. Testifying on his own behalf, the defendant said that he was struck on the head during the argument with his wife on July 5th and that he remembered nothing until he found himself in the Linden jail on July 6th. He further said that he blacked out again after he was taken to identify the bodies of his wife and sister-in-law and that he recalled nothing until he found himself in the Union County Jail on July 7th. Two psychiatrists and a psychologist testified for the defendant that he was legally insane on July 5th when his wife and sister-in-law were killed. Two psychiatrists testified for the State that the defendant was legally sane when the killings occurred.

After the jury returned its verdicts the defendant moved for a new trial. This motion was dismissed when the defendant advised the court and his counsel that he did not wish to proceed. Later the defendant changed his mind and a further notice of motion for new trial was then filed. This motion was denied on the ground that it had not been filed within the time allowed by *R. R.* 3:7–11(a). In support of his appeal, the defendant asserts various grounds of alleged error during the trial and in the denial of the motion for new trial; they will now be considered in the order in which they have been presented in the defendant's brief.

I.

The defendant's first point attacks the consolidation of the indictments as violative of his "rights to a fair and im-

partial trial as guaranteed by the New Jersey and United States Constitutions." *R. R.* 3 :5–6 provides that the court may order two or more indictments to be tried together if the offenses could have been joined in a single indictment. *R. R.* 3 :4–7 provides that two or more offenses may be charged in the same indictment if they "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." The offenses here were clearly of the same or similar character and there can be no question that the consolidation came within the broad terms of the rules. See *State v. Manney,* 26 *N. J.* 362, 365–366 (1958) ; *State v. Begyn,* 34 *N. J.* 35, 56–57 (1961) ; *cf. State v. Weiner,* 41 *N. J.* 21, 34–36 (1963).

In the interests of economy and efficiency, similar or related offenses may be joined for single trial so long as the defendant's right to a fair trial remains unprejudiced. Where prejudice appears, the defendant may readily obtain a severance or other suitable relief. See *R. R.* 3 :5–7. Here the defendant did not at any time during the trial apply for severance although he had voiced his opposition to the State's motion before trial for consolidation of the indictments. In any event, we fail to find in the record any indication of prejudice to the defendant by virtue of the consolidation. There was no dispute at the trial that the defendant had killed his wife and sister-in-law and the defense rested entirely on insanity. The consolidation protected the defendant against any danger of multiple prosecutions (*cf. State v. Hoag,* 21 *N. J.* 496 (1956), aff'd 356 *U. S.* 464, 78 *S. Ct.* 829, 2 *L. Ed.* 2d 913 (1958)) and was helpful rather than harmful to his defense which rested heavily on the bizarreness of his entire course of conduct through his last act of violence. Indeed, in his brief the defendant explicitly points out that even the State's evidence of the assaults which did not result in death was not objected to because it was felt that it "would support the defendant's plea and would indicate the defendant's mental condition at the time of the offenses."

In its charge, the trial court clearly instructed the jury that the defendant was entitled to have his guilt or innocence separately assessed on each indictment and that the determination of his guilt or innocence on one indictment should not be considered as indicative of his guilt or innocence on the other. The jury's capacity to follow the trial court's instructions on this score was forcefully evidenced by its variant determinations on the two killings. Unlike other situations (*Drew v. United States,* 118 *U. S. App. D. C.* 11, 331 *F. 2d* 85 (1964)) where the nature of the multiple charges and the State's evidence may have suggested the danger of confusion (*Note,* 74 *Yale L. J.* 553 (1965)) or the likelihood that the charges would be used "to prove each other or prove themselves through the sheer weight of numbers" (*State v. Weiner, supra,* 41 *N. J.,* at *p.* 35), here, there was no such danger or likelihood. We are satisfied that the trial court acted well within the bounds of its discretion in consolidating the indictments for trial. *Cf. Peterson v. United States,* 344 *F. 2d* 419, 422 (5 *Cir.* 1965); *Johnston v. United States,* 260 *F. 2d* 345, 346 (10 *Cir.* 1958), *cert.* denied 360 *U. S.* 935, 79 *S. Ct.* 1454, 3 *L. Ed. 2d* 1547 (1959); *Commonwealth v. Patrick,* 416 *Pa.* 437, 206 *A. 2d* 295, 298 (1965); *Commonwealth v. Fancy, Mass.,* 207 *N. E. 2d* 276, 282 (1965).

## II.

The defendant contends that the trial court erred in refusing to grant his motion for a jury view of the premises. *N. J. S.* 2A:77–1 provides that in any civil or criminal case the court may order "that the jury view the lands, places or personal property in question if that will enable the jury better to understand the evidence." The view is not independent evidence in the cause but may be used to serve as an aid to the jury's understanding of the evidence properly introduced before it by the parties. See *Bancroft Realty Co. v. Alencewicz,* 7 *N. J. Super.* 105, 109–110 (*App. Div.* 1950). Whether a view would be necessary or helpful in any given instance

and should therefore be ordered rests within the trial court's sound discretion. See *State v. Jackson,* 43 *N. J.* 148, 170 (1964); *State v. King,* 133 *N. J. L.* 480, 483 (*Sup. Ct.* 1945), aff'd 135 *N. J. L.* 286 (*E. & A.* 1947); *Braelow v. Klein,* 100 *N. J. L.* 156, 158 (*E. & A.* 1924); 2 *Wharton Criminal Evidence* § 681 (*12th ed.* 1955); 4 *Wigmore, Evidence* § 1164 (*3d ed.* 1940).

The defendant urges that the elements of time and distance were important in the presentation of his defense and that a view would have aided the jury in its understanding of the evidence. But, as the trial court properly pointed out, the jury had many pictures of the area as well as diagrams and the defense could readily have introduced a drawing to scale if it considered it to be advantageous. There were no evidential complexities bearing on the elements of time and distance and there is no reason to suspect that the jury had any difficulties in this connection. The trial court's denial of the motion for a jury view was not improper and did not result in any prejudice to the defendant. See *R. R.* 1:5–1.

### III.

The defendant claims that the introduction into evidence of photographs of the bodies of Millie Coleman and Ruby Coleman was prejudicial. The photographs (1 of Millie and 1 of Ruby) were not inflammatory or gruesome. They were in black and white and did not show front views of faces of the victims or their wounds. They did show the positions of the bodies immediately after the shootings and were to some extent evidential; indeed defense counsel during the course of his summation made a specific argument on the basis of the position of Ruby's body and referred to the photograph in support. In *State v. Smith,* 32 *N. J.* 501 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961), we pointed out that the admission of photographs having some probative value, even where cumulative and somewhat inflammatory, rests within the discretion of the

trial judge, "whose ruling will not be overturned save for abuse, as where logical relevance will unquestionably be overwhelmed by the inherently prejudicial nature of the particular picture" (32 *N. J.*, at *p.* 525). It appears to us that here the photographs were not at all prejudicial and that the trial court did not exceed its discretionary authority in admitting them. See *State v. Hale,* 45 *N. J.* 255, 262–263 (1965); *State v. Bucanis,* 26 *N. J.* 45, 52–55, *cert.* denied 357 *U. S.* 910, 78 *S. Ct.* 1157, 2 *L. Ed.* 2d 1160 (1958); Annot., 73 *A. L. R.* 2d 769 (1960).

## IV.

The defendant contends that the trial court erred in permitting Detective Carmine Lonardo to testify though his name had not been set forth in the State's answer to the defendant's demand for particulars. Although the defendant originally had made a broader demand, he withdrew it on the understanding that the State would supply the names of "all persons possessing knowledge of relevant facts concerning the alleged crime, but not a list of witnesses who may be called by the State at the trial." In its particulars the State listed many names but neglected to include Detective Lonardo's name. However, well before trial, the State had given defense counsel a copy of the defendant's July 6th statement which disclosed, at its beginning, that it was made before "U. C. Det. H. Frankel & Det. C. Lonardo" and, at its close, that it was sworn to before Detective Frankel and was witnessed by several persons including Detective Lonardo.

When Detective Lonardo was called by the State as a witness, defense counsel voiced his objection on the ground that the Detective's name had not been listed in the particulars furnished by the State. The Prosecutor pointed out that defense counsel was undoubtedly aware that Detective Lonardo would be called as a witness since he knew that the Detective had participated in the taking of the statement. When the trial court inquired as to how the defendant was

harmed, defense counsel made no showing and gave no indication of prejudice. The Detective was then permitted to testify. His testimony related largely to the defendant's conduct on July 6th, concluding with the taking of his statement on that day. There was full cross-examination and at the close of the trial day there was no request for any continuance to enable further investigation or preparation or for any later recall of the witness. Examination of the entire record, which includes ample testimony by other witnesses for the State with respect to the subject matter of the Detective's testimony, convinces us that the defendant did not suffer any prejudice from the State's failure to include the Detective's name in the list furnished by the State; the trial court's action in permitting the testimony was not reversible error. See *United States v. Glaze,* 313 *F.* 2d 757 (2 *Cir.* 1963); *cf. State v. Driver,* 38 *N. J.* 255, 289 (1962).

## V.

While the defendant was testifying on direct examination, he stated that, during their married life, he and his wife "got along good," that they were active in church organizations, and that he had been "appointed on a Deacon board" and she "was Deaconess." On cross-examination, the Prosecutor asked whether the defendant had not had arguments with his wife about what had happened in Woodbridge in 1958. He followed this with a question as to whether the defendant had not picked up a Mrs. Sue Jones in the Plaza Bar. At this point defense counsel objected on the ground of irrelevancy. This objection was overruled and the Prosecutor pursued his inquiry as to whether the defendant had not had arguments with his wife about the Jones incident and about his going out with other women.

▇ The defendant now contends that the trial court committed prejudicial error in permitting the Prosecutor to cross examine "about the Plaza Bar incident." The Prosecutor's inquiry not only attacked the credibility of the defendant's

direct testimony but also bore on a substantive issue in the case. The State's position was that the defendant had long quarreled with his wife, that she was about to leave him, and that he purposefully killed her. On the other hand, the defendant alleged that there was no significant hostility between them and that he shot her while he was insane. In the light of the issue thus presented, the State's inquiries on cross examination, designed to confirm the motive advanced by it and to rebut the defendant's assertion as to the harmony of his relations with his wife, were relevant and proper. See *Perkins, Criminal Law* 721 (1957) ; *McCormick, Evidence* 55 (1954).

## VI.

The defendant urges that "the inflammatory remarks and name calling by the Prosecutor during the trial and in his summation were plain error." He cites several instances in which the Prosecutor referred to the defendant as a killer who used the two guns in his hands "as the instruments of justice" and who "didn't mind using guns when other people didn't have them"; other instances in which the Prosecutor asked the jury to show the same mercy or sympathy that the defendant "showed to these two women"; and still others in which he questioned the testimony of the expert witnesses for the defense and the qualifications of one of them. The defendant also lays stress on an occasion during the trial where the Prosecutor, while stating that he had given defense counsel a copy of the statement "of the defendant Coleman over here," pointed to the defendant. Defense counsel objected to the Prosecutor's conduct in pointing to the defendant, at which juncture the Prosecutor said, "Well, he is the defendant. I didn't kill these people."

We fail to find any plain error or any prejudice to the defendant in the Prosecutor's conduct or remarks. At no time during the trial did defense counsel voice any pertinent objection or indicate that he thought the court should take corrective action. See *State v. Bucanis, supra,* 26 *N. J.,* at *p.* 57.

In its charge the court explicitly instructed the jury that the evidence did not consist of anything said by counsel or the court, that its deliberations were to be concerned solely with the evidence brought out by the testimony of the witnesses and the exhibits, and that sympathy, passion, prejudice and bias were not to play any part in its determinations. None of the Prosecutor's remarks lacked the support of evidence by the State (*State v. Reynolds,* 41 *N. J.* 163, 184–185 (1963), *cert.* denied 377 *U. S.* 1000, 84 *S. Ct.* 1930, 12 *L. Ed. 2d* 1050 (1964)), and, none of them can be said to have impaired the defendant's right to a just trial. The record discloses that the trial judge conducted the proceedings with eminent fairness and that displays of emotion were kept at a minimum throughout. The defendant had killed the two women and while some of the Prosecutor's remarks may here be viewed as needlessly colorful, they did not go beyond the outer trial limits recognized by the precedents. See *State v. Johnson,* 31 *N. J.* 489, 510–513 (1960).

## VII.

The contention is made that the defendant's "oral and written confessions were not voluntary and their admission into evidence was a denial of his constitutional rights." Since the defendant's position at the trial was that he recalled nothing other than being taken to identify the bodies of his wife and sister-in-law at the funeral home, the State's evidence as to voluntariness was substantially uncontroverted. It indicated that when the defendant was first apprehended and taken to Newark Police Headquarters, he identified himself as Richard Coleman and admitted that he had shot his wife and sister-in-law. After having been examined by a physician and having been brought before a magistrate, he was taken to Linden Police Headquarters where he was questioned briefly during the morning. Detective Frankel left the Headquarters at about 4 P. M. while the lefendant was sleeping in his cell. Later the Detective received a call at his home that the de-

fendant wanted to see him and he returned to the Headquarters, arriving there at 8 :15 P. M.

Detective Frankel testified that the defendant told him that he wanted to make a statement but that he would like Reverend Schell to be present; he thereupon called the Reverend who arrived at about 9 P. M. in the company of Mr. Patterson, a trustee of the Reverend's church; the defendant was then removed from his cell and conferred with the Reverend in a private office until about 9 :25 P. M.; thereafter the taking of the statement began in the presence of the Reverend, Mr. Patterson and several police officers, with Detective Frankel doing the questioning and Detective Lonardo the typing.

Detective Frankel testified further that before the questioning began he told the defendant that he did not have to give a statement and that what he said could be used later. The defendant did not at any time request counsel, his only request having been for the attendance of Reverend Schell. The statement set forth that the defendant was making it of his own free will and disclosed, on its face, that the questioning was at one point interrupted to enable the defendant to confer then with Reverend Schell. A snapshot of the scene, taken by Detective Frankel and portraying the reading of the statement after its typing had been completed, was received in evidence.

Detective Lonardo and Mr. Patterson both testified that Reverend Schell and the defendant had conferred privately for about 15 minutes before the statement was taken; however, the Reverend testified that although he was present during the taking of the statement and talked to the defendant afterwards, he had not talked to him before the interrogation began. The trial court expressly found that the statement was a voluntary one and admitted it into evidence with later instructions which submitted to the jury not only its credibility but also its voluntariness. See *State v. Hodgson,* 44 *N. J.* 151, 161–162 (1965).

The defendant attacks the trial court's finding of voluntariness, stressing the visit to the funeral home to identify

the bodies and citing *Davis v. United States,* 32 *F.* 2d 860 (9 *Cir.* 1929). In *Davis* the defendant, while asserting self defense, was taken at three o'clock in the morning to a morgue where, after viewing the body for about an hour, he altered his story and confessed. Here the defendant had admitted the killings, was taken at one o'clock in the afternoon to the funeral home where he remained for about 5 or 10 minutes, was returned to his cell where he slept during part of the afternoon, stated during the early evening hours that he wanted to make a statement in the presence of Reverend Schell, and later made his statement in the manner hereinbefore described. Under these circumstances it cannot at all be inferred that the brief visit to the funeral home, which occurred more than 7 or 8 hours before the taking of the statement began, either overbore the defendant's will or impaired his ability to make a free and unconstrained choice. See *Culombe v. State of Connecticut,* 367 *U. S.* 568, 602, 81 *S. Ct.* 1860, 6 *L. Ed.* 2d 1037, 1057–1058 (1961). The trial court's finding of voluntariness was well supported by the evidence before it, and our examination of the record in accordance with the principles expressed in *State v. Smith, supra,* 32 *N. J.,* at *pp.* 540–544 leads us to the same finding.

The defendant urges that before his statement was taken he should have been afforded an opportunity to confer with legal counsel and that under *Escobedo v. State of Illinois,* 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed.* 2d 977 (1964), his constitutional rights under the sixth amendment made obligatory on the states by the fourteenth amendment were violated. In *Escobedo* the accused had been released on a writ of *habeas corpus* obtained by his attorney. He was again picked up at a later date, asked to see his attorney, and was falsely told that his attorney did not want to see him. In fact his attorney had asked and had been denied permission by the police to see him. Without being advised that he was not required to make any statement and without being afforded any opportunity to consult with his lawyer, he was interrogated and his incriminating statement was admitted into evidence

at the trial. In setting aside his conviction, the Supreme Court said that under the circumstances it was obligatory that the accused be permitted to consult with his lawyer. The precise determination of the Supreme Court, in its own language, was as follows:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon v. Wainwright,* 372 *U. S.* [335], at 342, 83 *S. Ct.* [792], at 795 [9 *L. Ed. 2d,* at 804, 93 *A. L. R. 2d* 733] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." 378 *U. S.,* at *pp.* 490–491, 84 *S. Ct.,* at *p.* 1765, 12 *L. Ed. 2d,* at *p.* 986.

In contrast to *Escobedo* the defendant here was not dealt with unjustly and, in the light of the nature of the case and the State's independent evidence, his statement may fairly be said to have had no significant bearing on his prosecution and its outcome. Detective Lonardo testified that when the defendant was first returned from Newark to Linden he said he was in trouble and wanted someone to talk to. At that point, the Detective said he would get anyone the defendant wanted. The defendant then suggested Reverend Schell who was called and who later, according to the persuasive testimony, conferred with the defendant privately before participating in the taking of the statement. As has already been pointed out, the defendant was told that he did not have to say anything and it is undisputed that he never requested an opportunity to confer with counsel or anyone other than Reverend Schell. In comparable situations this Court has held the holding in *Escobedo* to be inapplicable. See *State v. Ordog,* 45 *N. J.* 347, 361–362 (1965) ; *State v. Lanzo,* 44 *N. J.* 560, 566–567 (1965) ; *State v. Bindhammer,* 44 *N. J.* 372, 384 (1965) ;

*State v. Hodgson, supra,* 44 *N. J.,* at *pp.* 162–163; *State v. Vigliano,* 43 *N. J.* 44, 49–52 (1964); *State v. Smith,* 43 *N. J.* 67, 83–84 (1964), *cert.* denied 379 *U. S.* 1005, 85 *S. Ct.* 731, 13 *L. Ed. 2d* 706 (1965).

We, of course, recognize that the United States Supreme Court is the final arbiter on all questions of federal constitutional law. See *Schlemm v. Schlemm,* 31 *N. J.* 557, 571 (1960); *cf. State v. Rosania,* 33 *N. J.* 267, 274 (1960). And if we believed that any actual holding or doctrinal determination of that Court called for reversal here, we would, of course, readily take such action. As we expressed it in *Schlemm:* "We, as state judges, would indeed disserve the interests of our country if, because of conflicting local policies, we in anywise sought to disregard or evade the decisions of the Supreme Court as to the meaning and effect of the Federal Constitution." 31 *N. J.,* at *p.* 571. But as we read *Escobedo,* the Supreme Court deliberately and explicitly confined its holding to the circumstances there presented (78 *Harv. L. Rev.,* at *pp.* 218, 429–430 (1964)) and although there is widespread belief in academic and other circles (32 *U. Chi. L. Rev.* 560 (1965); 19 *Rutgers L. Rev.* 111 (1964); 88 *N. J. L. J.* 681 (1965)) that the Supreme Court will in due course eliminate all confessions by unrepresented suspects in custody, it has not yet done so. If it chooses to take that step, it will undoubtedly avail itself of unequivocal language. In the meantime, the New Jersey view of *Escobedo,* as consistently expressed in *Smith, Vigliano, Bindhammer, Hodgson, Lanzo* and *Ordog, supra,* renders it inapplicable where, as here, the defendant was advised of his right to remain silent, was told that he could speak to anyone he wanted and made no request for counsel. Although there are differing views of substantial nature elsewhere (see *People v. Dorado,* 42 *Cal. Rptr.* 169, 398 *P. 2d* 361, *cert.* denied 381 *U. S.* 946, 85 *S. Ct.* 1793, 14 *L. Ed. 2d* 710 (1965)), the New Jersey view finds support in many state and lower federal court decisions. See *People v. Hartgraves,* 31 *Ill. 2d* 375, 202 *N. E. 2d* 33 (1964), *cert.* denied 380 *U. S.* 961, 85 *S. Ct.* 1104, 14 *L. Ed. 2d* 152 (1965);

*Sturgis v. State,* 235 *Md.* 343, 201 *A.* 2*d* 681 (1964) ; *Carson v. Commonwealth, Ky.,* 382 *S. W.* 2*d* 85 (1964), *cert.* denied 380 *U. S.* 938, 85 *S. Ct.* 949, 13 *L. Ed.* 2*d* 825 (1965) ; *Browne v. Slate,* 24 *Wis.* 2*d* 491, 131 *N. W.* 2*d* 169 (1964), *cert.* denied 379 *U. S.* 1004, 85 *S. Ct.* 730, 13 *L. Ed.* 2*d* 706 (1965) ; *Bean v. State, Nev.,* 398 *P.* 2*d* 251 (1965) ; *People v. Gunner,* 15 *N. Y.* 2*d* 226, 257 *N. Y. S.* 2*d* 924, 205 *N. E.* 2*d* 852 (1965) ; *Jackson v. United States,* 337 *F.* 2*d* 136 (*D. C. Cir.* 1964), *cert.* denied 380 *U. S.* 935, 85 *S. Ct.* 944, 13 *L. Ed.* 2*d* 822 (1965) ; *Long v. United States,* 119 *U. S. App. D. C.* 209, 338 *F.* 2*d* 549 (*D. C. Cir.* 1964) ; *Davidson v. United States,* 236 *F. Supp.* 264 (*W. D. Okla.* 1964) ; *Davis v. State of North Carolina,* 339 *F.* 2*d* 770 (4 *Cir.* 1964) ; *Edwards v. Holman,* 342 *F.* 2*d* 679 (5 *Cir.* 1965). See also *United States ex rel. Townsend v. Ogilvie,* 334 *F.* 2*d* 837 (7 *Cir.* 1964), *cert.* denied 379 *U. S.* 984, 85 *S. Ct.* 683, 13 *L. Ed.* 2*d* 574 (1965) ; *Otney v. United States,* 340 *F.* 2*d* 696, 702 (10 *Cir.* 1965) (concurring opinion) ; *Mitchell v. Stephens,* 232 *F. Supp.* 497 (*E. D. Ark.* 1964) ; *Duncan v. State,* 278 *Ala.* 145, 176 *So.* 2*d* 840, 861–863 (1965) ; *State v. Miranda,* 98 *Ariz.* 18, 401 *P.* 2*d* 721 (1965) ; *State v. Fox, Iowa,* 131 *N. W.* 2*d* 684 (1964) ; *Comm. v. Tracy, Mass.,* 207 *N. E.* 2*d* 16 (1965) ; *State v. Worley,* 178 *Neb.* 232, 132 *N. W.* 2*d* 764, 768 (1965) ; *Pece v. Cox,* 74 *N. M.* 591, 396 *P.* 2*d* 422 (1964) ; *State v. Elam,* 263 *N. C.* 273, 139 *S. E.* 2*d* 601 (1965) ; *Ward v. Comm.,* 205 *Va.* 564, 138 *S. E.* 2*d* 293 (1964).

In *United States ex rel. Russo v. New Jersey,* 351 *F.* 2*d* 429 (3 *Cir.* 1965), the court, on *habeas corpus,* recently set aside the convictions of the defendants Russo and Bisignano which had been sustained by this Court in *State v. LaPierre,* 39 *N. J.* 156, *cert.* denied 374 *U. S.* 852, 83 *S. Ct.* 1920, 10 *L. Ed.* 2*d* 1073 (1963). In the course of its decision, the Third Circuit went beyond the actual holding in *Escobedo* and construed the Supreme Court's opinion as broadly invalidating confessions such as those made by the defendants Russo and Bisignano while in custody and without counsel,

no request for counsel having been made by them. The view thus expressed, while binding in *Russo* (subject to any further review in the Supreme Court), is not binding on us in other cases which come before us in the exercise of our acknowledged State jurisdiction. In passing on federal constitutional questions, the state courts and the lower federal courts have the same responsibility and occupy the same position; there is parallelism but not paramountcy for both sets of courts are governed by the same reviewing authority of the Supreme Court. 28 *U. S. C. A.* §§ 1254, 1257 (1949). See *Brown v. Palmer Clay Products Co.,* 290 *Mass.* 108, 195 *N. E.* 122 (1935), aff'd 297 *U. S.* 227, 56 *S. Ct.* 450, 80 *L. Ed.* 655 (1936); *People ex rel. Ray v. Martin,* 294 *N. Y.* 61, 60 *N. E.* 2d 541 (1945), aff'd 326 *U. S.* 496, 66 *S. Ct.* 307, 90 *L. Ed.* 261 (1946); *Rohr Aircraft Corporation v. County of San Diego,* 51 *Cal. 2d* 759, 336 *P. 2d* 521 (1959), rev'd on other grounds 362 *U. S.* 628, 80 *S. Ct.* 1050, 4 *L. Ed. 2d* 1002 (1960). See also *Lewis v. Braun,* 356 *Ill.* 467, 191 *N. E.* 56 (1934); *Home Ins. Co. of New York v. Northern Pac. Ry. Co.,* 18 *Wash. 2d* 798, 140 *P. 2d* 507 (1943); *State ex rel. St. Louis, B. & M. R. Co. v. Taylor,* 298 *Mo.* 474, 251 *S. W.* 383 (1923), aff'd 266 *U. S.* 200, 45 *S. Ct.* 47, 69 *L. Ed.* 247 (1924); *LaBonte v. New York, N. H. & H. R. R.,* 341 *Mass.* 127, 167 *N. E. 2d* 629 (1960); *Lapp Insulator Co. v. Boston & M. R. R.,* 330 *Mass.* 205, 112 *N. E. 2d* 359 (1953); *New York Rapid Transit Corp. v. City of New York,* 275 *N. Y.* 258, 9 *N. E. 2d* 858 (1937), aff'd 303 *U. S.* 573, 58 *S. Ct.* 721, 82 *L. Ed.* 1024 (1938); *Zurich Gen. Acc. & Liab. Ins. Co. v. Lackawanna Steel Co.,* 164 *Misc.* 498, 299 *N. Y. S.* 862 (1937), aff'd 254 *App. Div.* 839, 6 *N. Y. S. 2d* 139 (1938), rev'd 279 *N. Y.* 495, 18 *N. E. 2d* 673, rev'd *Bethlehem Steel Co. v. Zurich,* 307 *U. S.* 265, 59 *S. Ct.* 856, 83 *L. Ed.* 1280 (1939); *Crowe v. Elmhurst Contracting Co.,* 191 *Misc.* 585, 74 *N. Y. S. 2d* 445 (1947), aff'd 273 *App. Div.* 999, 79 *N. Y. S. 2d* 876 (1948); *Clausen v. Panama Transport Co.,* 103 *N. Y. S. 2d* 624, 628 *(Sup. Ct.* 1951); *Beezer v. City of Seattle,* 62 *Wash. 2d* 569, 383 *P. 2d* 895, 897 (1963), rev'd

376 *U. S.* 224, 84 *S. Ct.* 709, 11 *L. Ed. 2d* 656 (1964) ; *York v. Gaasland Co.,* 41 *Wash. 2d* 540, 250 *P. 2d* 967, 971 (1952) ; *Penn. R. R. v. F. E. Mathias Lumber Co.,* 113 *Ind. App.* 133, 47 *N. E. 2d* 158 (1943) ; *Hangelias v. Dawson,* 158 *Pa. Super.* 370, 45 *A. 2d* 392 (1946) ; *Comm. ex rel. Goodfellow v. Rundle,* 203 *Pa. Super.* 419, 201 *A. 2d* 615 (1964) ; *cf. Note,* "Authority in State Courts of Lower Federal Court Decisions on National Law," 48 *Colum. L. Rev.* 943 (1948), where the author points out that, when adjudicating federal questions, the state courts form an integral part of the national structure and that:

"In that capacity they occupy exactly the same position as the lower federal courts, which are coordinate, and not superior to them. There is no appeal from the state to the lower federal courts. Instead both are subject to the reviewing power of the Supreme Court, which furnishes the unifying principle. Decisions of a lower federal court are no more binding on a state court than they are on a federal court not beneath it in the judicial hierarchy." 48 *Colum. L. Rev.,* at *pp.* 946–947.

See also *Iowa Nat. Bank v. Stewart,* 214 *Iowa* 1229, 232 *N. W.* 445 (1930), rev'd on other grounds *Iowa-Des Moines National Bank v. Bennett,* 284 *U. S.* 239, 52 *S. Ct.* 133, 76 *L. Ed.* 265 (1931), where Chief Justice Morling aptly summarized the governing principle which finds broad support in the many state decisions cited above:

"The federal Circuit Courts of Appeals and, in respect to federal law, the state courts of last resort are subject to the supervisory jurisdiction of the Supreme Court of the United States. They are, however, as to the laws of the United States, co-ordinate courts. Finality of determination in respect to the laws of the United States rests in the Supreme Court of the United States. Until the Supreme Court of the United States has spoken, state courts are not precluded from exercising their own judgment upon questions of federal law. They are not concluded by, though they should give respectful consideration to, the decisions of the federal Circuit Courts of Appeals and District Courts. *Wells v. Western Union Telegraph Co.,* 144 *Iowa,* 605, 611, 123 *N. W.* 371, 24 *L. R. A.* (*N. S.*) 1045, 138 *Am. St. Rep.* 317 ; *State [ex rel St. Louis, B & M. R. Co.] v. Taylor,* 298 *Mo.* 474, 251 *S. W.* 383 ; *Walters v. Commonwealth,* 199 *Ky.* 182, 250 *S. W.* 839." 232 *N. W.,* at *p.* 454

When *Russo* was handed down it became apparent that troublesome situations might arise, since any convicted defendant could seek *habeas corpus* relief in the New Jersey federal district court which would be bound by the *Russo* view. In an effort to avoid conflict and unseemliness we immediately directed that, wherever practicable, pending cases should be tried without using confessions and that wherever that was not feasible, there should be a postponement of the trial date. In other respects we announced that, while awaiting further clarification from the Supreme Court, we would adhere to our many earlier decisions as to the limits of *Escobedo*. The case before us was tried in March 1964, shortly before *Escobedo* and long before *Russo*. As we read the record and under our consistent interpretation of *Escobedo*, there was neither injustice nor constitutional violation in the admission of the defendant's statement here into evidence. If, notwithstanding all this, we were now to reverse because of the lower federal court's holding in *Russo*, we would be (1) abdicating our undoubted responsibility to pass on issues of constitutionality and justice as we see them, (2) imposing on the people of New Jersey what we believe to be the unwarranted burdens and dangers of retrying the defendant for the killing of his wife, and (3) impairing the proper balance, which we believe is being maintained in the current New Jersey decisions, between the treasured individual liberties and the urgent societal need for affording fair interrogational opportunities to law enforcement officials. But *cf. Commonwealth v. Negri, Pa.,* 213 *A.* 2d 670 (1965) ; see *Breckline v. Metropolitan Life Insurance Co.,* 406 *Pa.* 573, 178 *A.* 2d 748, 2 *A. L. R.* 3d 1135 (1962) ; *Thomas v. Hempt Bros.,* 371 *Pa.* 383, 89 *A.* 2d 776 (1952), rev'd on other grounds 345 *U. S.* 19, 78 *S. Cl.* 568, 97 *L. Ed.* 751 (1953).

## VIII.

 The defendant contends that error was committed by the trial court in refusing certain of his "requests to charge

and in its charge on the law as to insanity." The charge must of course be read as a whole. See *State v. Bertone,* 39 *N. J.* 356, 368 (1963) ; *State v. Hale,* 45 *N. J.* 255, 264 (1965). As thus read, it properly submitted the pertinent issues to the jury for its determination. The rejected requests were either sufficiently encompassed by the charge or were uncalled for by the evidence. See *State v. Borrell,* 18 *N. J.* 16, 25 (1955) ; *State v. Rogers,* 19 *N. J.* 218, 238 (1955). The charge on the law of insanity was proper in the light of the *M'Naghten* rule which is followed in this State and is not attacked by the defendant here. See *State v. Lucas,* 30 *N. J.* 37, 63–72 (1959) ; *State v. Trantino,* 44 *N. J.* 358, 367 (1965) ; *State v. Sikora,* 44 *N. J.* 453, 470 (1965).

The trial court first correctly expressed the *M'Naghten* test of insanity, namely, that the accused was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, *or,* if he did know it, that he did not know what he was doing was wrong. See *State v. Lucas, supra,* 30 *N. J.,* at *p.* 68. It then followed it with a statement that: "If the accused has sufficient mind at the time of the act to know the nature and quality of his act *and* the difference between right and wrong with respect to the act he did, he cannot discharge himself from responsibility. He is not legally insane under the law." The defendant questions the presence of the conjunctive "and" but its use in the quoted language as to when there was no insanity, as distinguished from the statement which preceded it as to when there was insanity, was entirely correct. In any event, the charge, when examined in its entirety, fully and fairly expressed the governing principles bearing on the asserted defense of insanity and the jury could not have been misled. See *State v. Bertone, supra,* 39 *N. J.,* at *p.* 368; *State v. Hale, supra,* 45 *N. J.,* at *p.* 264.

## IX.

The defendant contends that the trial court should not have received the verdict of guilty on indictment No. 405

in view of the jury's finding under indictment No. 406 that the defendant's insanity continued to the present time. His position is that the finding meant that he was incapable of standing trial and that consequently the verdict of guilty cannot stand. But the jury's finding had no such meaning. As was pointed out in *Aponte v. State,* 30 *N. J.* 441 (1959), the term "insanity" has varying meanings and applications in the law. (1) It may refer to the lack of criminal responsibility as a defense to crime and in this connection the test of *M'Naghten* is applicable; (2) it may refer to a commitment to a mental institution in which instance it means a mental disorder which renders the subject dangerous to himself or others; and (3) finally, it may refer to the ability to stand trial and here it means a mental disorder which prevents the accused from comprehending his position or from consulting properly with counsel in the preparation of his defense. 30 *N. J.,* at *p.* 450; see also Henderson, J., dissenting in *Rowe v. State,* 234 *Md.* 295, 199 *A. 2d* 785, 798 (1964). It is well recognized that an accused may have a mental disorder but may nevertheless understand his position and be able to assist fully in his own defense. See *State v. Aponte, supra,* 30 *N. J.,* at *pp.* 452–453; *State v. Noel,* 102 *N. J. L.* 659, 669–672 (*E. & A.* 1926); Settle and Oppegard, "The Pre-Trial Examination of Federal Defendants," 35 *F. R. D.* 475, 480 (1964); *cf. Weihofen, Mental Disorder as a Criminal Defense,* 428–436 (1954).

The psychiatrists who testified during the trial did not suggest that the defendant was then in no condition to stand trial. The State's psychiatrists denied all insanity. Dr. Revitch and Dr. Colley, who testified for the defense, said that the defendant was in a "paranoid state" but their testimony contained no indication that the defendant did not then comprehend his position or was unable to assist fully in his own defense. Thus Dr. Revitch, who described the defendant's state at the time of the shooting as a "catathymic crisis" or emotional disintegration, said it was now in remission though it may recur under conditions of stress. Dr. Colley testified

that, although in July when the killings took place the defendant had no controls and had what may be described as an alteration of consciousness or a disassociated period, when he examined him in October he found that the defendant did not have this "disassociation phenomena," was able to perceive reality and had controls in operation.

At no time before or during the trial did the defense counsel make any motion grounded on the assertion that the defendant was unable to stand trial. *Cf. N. J. S.* 2A:163–2; *State v. Lucas, supra,* 30 *N. J.,* at *pp.* 72–74. At one point when the defendant began to sob, the trial court interrupted the proceedings and had him examined by Dr. Baruch, a duly qualified physician. Dr. Baruch testified that he found the defendant understood his situation, was able to consult intelligently with counsel, and was able to proceed with the trial. Defense counsel asked Dr. Baruch no questions, voiced no objection to the trial court's direction that the trial proceed, and made no motion. Later, the defendant testified on his own behalf. The nature of his testimony gave further support for the trial court's judgment that there was no inability on the defendant's part to stand trial.

At no point was the jury called upon to make any determination as to the defendant's ability to stand trial and it appears evident that its finding of continuing insanity was not intended to bear on that issue. Its finding was made pursuant to the trial court's instructions which dealt fully with insanity under the *M'Naghten* test but made no mention at all of ability to stand trial; it was made in fulfillment of *N. J. S.* 2A:163–3 which, for commitment purposes, makes provision for a jury finding as to whether the insanity continues to the present. *Cf. Aponte v. State, supra,* 30 *N. J.* 441. The case of *Rowe v. State, supra,* 234 *Md.* 295, 199 *A.* 2d 785, upon which the defendant relies, dealt with Maryland statutes which may readily be differentiated from ours; in any event, there were several dissenters and their views bearing on the contention before us, seem to be the more persuasive. See 199 *A.* 2d, at *pp.* 798–800. We find no error in the trial court's

receipt of the guilty verdict on indictment No. 405 along with the finding of continuing insanity under indictment No. 406.

## X.

The defendant attacks the jury's verdicts as "inconsistent and contradictory." The only appeal before us is from the guilty verdict under indictment No. 405 and it might well be said that that verdict could stand independently without regard to any inconsistency with the verdict of not guilty under indictment No. 406. See *Dunn v. United States,* 284 *U. S.* 390, 52 *S. Ct.* 189, 76 *L. Ed.* 356 (1932) ; cf. *State v. Dancyger,* 29 *N. J.* 76, 93, *cert.* denied 360 *U. S.* 903, 79 *S. Ct.* 1286, 3 *L. Ed. 2d* 1255 (1959) ; *United States v. Maybury,* 274 *F. 2d* 899 (2 *Cir.* 1960) ; *Comment,* "Inconsistent Verdicts in a Federal Criminal Trial," 60 *Colum. L. Rev.* 999 (1960). However, we need not pursue this for we are satisfied that there was no necessary inconsistency or contradiction in finding the defendant guilty of killing his wife and not guilty by reason of insanity of the subsequent killing of his sister-in-law.

During the trial the defense psychiatrists, Dr. Revitch and Dr. Colley, who testified generally that the defendant was insane, were not asked specifically whether the defendant might have been sane when he shot his wife and insane when he shot his sister-in-law. But Dr. Fink, the psychologist who testified for the defense, was asked whether the defendant might know the difference between right and wrong at one moment and thereafter not know it and his reply was "It would constantly fluctuate." Dr. Revitch testified the defendant probably was aware that he had a gun and if he pulled the trigger he would do harm, but that he was seized by anger, his awareness of what he was doing was reduced, and his actions became automatic without conscious control. Dr. Colley testified that the defendant probably knew he had guns in his hand and that if he pulled a trigger he would cause harm but that he was then overwhelmed by his hatred. The State's psychiatrists

testified unrestrictedly that the defendant was sane, knew the nature and quality of his acts and what he was doing was wrong.

The jury was at liberty to reject any portions of the aforementioned testimony which they discredited and to consider the evidence before it in the light of human experiences and understandings. Thus it could fairly conclude that the defendant had quarreled with his wife, she was about to leave him, and in anger or desperation but while sane within *M'Naghten,* he killed her. It could also fairly conclude that, the shocking deed having been done, he then went berserk and aimlessly killed and wounded others while insane within *M'Naghten.* We, of course, cannot be certain as to the internal processes which actually occurred for, as the psychiatrists themselves would readily acknowledge, they do not have all the answers. But clearly the jury's diverse treatment of the two killings does not offend common sense nor result in any unfairness or injustice; we find no basis for upsetting the guilty verdict under indictment No. 405 as inconsistent with or contradictory to the verdict under indictment No. 406.

## XI.

The defendant contends that the verdict represented a compromise by the jury and that the conviction appealed from should be reversed under *In re Stern,* 11 *N. J.* 584 (1953), and *Hyde v. United States,* 225 *U. S.* 347, 381, 32 *S. Ct.* 793, 56 *L. Ed.* 1114, 1131–1132 (1912). Those cases dealt with situations where the jury was unable to agree, was given further instructions, and returned shortly thereafter with the verdict of guilty. In *Hyde,* the further instructions were found not coercive and the verdict was sustained whereas in *Stern* they were found coercive and the verdict was upset. Neither case has any bearing here where the court in its charge correctly instructed that a determination of guilt or innocence on one of the indictments was not to be considered as indicative of guilt or innocence on the other and the ver-

dicts actually returned by the jury were explicitly set forth in the list of possible verdicts enumerated by the trial court in its charge. There is no reason to question the conscientiousness of the jury's deliberations and, as has already been pointed out, there was no necessary inconsistency or contradiction in its verdicts. The defendant's assertion that there was a compromise is sheer speculation, finds no legal support in the record, and clearly furnishes no basis for reversal. See *State v. Dancyger, supra,* 29 *N. J.,* at *p.* 93.

## XII.

The defendant's final contention is that it was error for the trial court to dismiss his motion for new trial for lack of jurisdiction under *R. R.* 3:7–11. That rule provides that a motion for new trial, on grounds other than newly discovered evidence, must be made within 10 days or within such further time as the trial court may fix within the 10-day period. Here the defendant first made a timely motion for a new trial. Pursuant to a personal request by the defendant, that motion was dismissed by an order dated August 3, 1964, consented to as to form by the Prosecutor and defense counsel. On August 26, 1964 a new and untimely notice of motion was filed by defense counsel asserting that the verdict was against the weight of the evidence, that the defendant was entitled to a judgment of acquittal, and that there were trial errors. All of the allegations of trial errors have been dealt with and rejected earlier in this opinion; the assertion that the defendant was entitled to a judgment of acquittal was baseless and is not pressed; and the assertion that the verdict of guilty under indictment No. 405 was against the weight of the evidence is unsupported by the record.

■■ *R. R.* 3:7–11 provides that the trial judge shall not set aside the verdict of a jury as against the weight of the evidence, unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, "it clearly and convincingly appears that the verdict was the re-

sult of mistake, partiality, prejudice or passion." Under that test the trial court could not properly have set the verdict aside as against the weight of the evidence even if the motion were timely. The jury could fairly find from the evidence that the defendant first quarreled with his wife who was about to leave him, then went and obtained the gun or guns from bureau drawers or elsewhere in the house, and then shot and killed her; and it could also fairly find that the killing was premeditated, deliberate and willful, bearing in mind that under the settled law of our State it is not necessary for first degree murder that any particular time elapse between the formulation of the purpose to kill and its execution. See *State v. VanDuyne,* 43 *N. J.* 369, 378–379 (1964), *cert.* denied 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed.* 2d 279 (1965) ; *State v. Bindhammer, supra,* 44 *N. J.,* at *p.* 389. The defendant had a full and fair trial, the jury's verdict of guilty of murder in the first degree for the killing of his wife was amply supported by the evidence, and there was no prejudicial error. Accordingly, the judgment of conviction under indictment No. 405 is:

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.