ANDREW PIERCE, Doing Business as ANDREW PIERCE TRADING POST, Respondent, *v.* STATE TAX COMMISSION OF THE STATE OF NEW YORK, Appellant.

Fourth Department, January 11, 1968.

*Louis J. Lefkowitz, Attorney-General (Julius L. Sackman* and *Ruth Kessler Toch* of counsel), for appellant.

*Omar Z. Ghobashy* for respondent.

HENRY, J. Defendant appeals from an order of Onondaga Special Term, which denied its motion for summary judgment and granted summary judgment to plaintiff, declaring that he is not subject to the Sales and Compensating Use Taxes imposed by articles 28 and 29 of the Tax Law.

Appellant admits plaintiff's allegations that he is a North American Indian in tribal relations, a member of the Onondaga Nation, one of the tribes of the Six Nations, Iroquois Confederacy, residing on the Onondaga Reservation, and that he owns a gift shop located on the Reservation selling articles made by tribal Indians living on the Reservation.

Respondent claims exemption from the tax on the grounds that the Onondaga Nation is a quasi-foreign nation, that its Reservation is quasi-extraterritorial, and that imposition of the tax would frustrate the Congressional purpose that no burden should be imposed upon commerce with the Indian Tribes except as authorized by acts of Congress.

The Onondaga Reservation has been occupied by the Onondaga Indians for centuries. Before 1786 Massachusetts and New York both laid claim to Western New York but neither State occupied it. Massachusetts claimed under the grant of King James to the Plymouth Company in 1606 of land between 41 and 45 degrees north latitude up into the land from Ocean to Ocean, and another grant by King Charles to the Massachusetts Bay Company in 1628 of land extending throughout all the mainland westwardly to the Southern Ocean. New York claimed under a charter granted in 1664 by Charles II to his brother James, the Duke of York, of all the land from the west side of Connecticut River to the east side of Delaware Bay (Original Charter of New York, 1 Original Books of Letters Patent 139–45).

By the Treaty of Hartford (dated December 16, 1786 and recorded in Ontario County Clerk's office in Liber 56 of Deeds at page 56), Massachusetts and New York settled their claims based upon the overlapping provisions of their grants. Massachusetts ceded to New York the right of pre-emption from the native Indians of the soil east of the pre-emption line, thereby recognizing the Indians' ownership thereof.

The Onondaga Reservation in Nedrow was reserved to the Onondagas by a treaty made between them and the State of New York on September 12, 1788 at Fort Stanwix. This treaty settled the boundaries of the Reservation, provided for an annuity to the Indians, and guaranteed the Onondaga reserve forever. (1 Clark, Reminiscenses of Onondaga 348–350; Turner, Pioneer History of the Holland Purchase of Western New York 306.) The settlement made in this treaty, as diminished by two

subsequent treaties, was confirmed in article II of the Treaty With Tribes of Indians Called the Six Nations, Jan. 21, 1795 (7 U. S. Stat. 44) by which the United States acknowledged "the lands reserved to the * * * Onondaga * * * Nation, in [its treaty] * * * with the state of New-York, and called their reservations, to be their property; and the United States will never claim the same, nor disturb them * * * in the free use and enjoyment thereof: but the said reservation shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase." The power of Congress to deal with them regardless of New York's actions or desires is unquestioned. (U. S. Const., art. I, § 8, cl. 3; art. VI, § 2; *Gibbons* v. *Ogden,* 9 Wheat. [22 U. S.] 1 [1824]; *McCulloch* v. *Maryland,* 4 Wheat. [17 U. S.] 316 [1819].)

The Indian Nations were considered by the United States as nations competent to govern themselves and were treated as free and independent tribes governed by their own chiefs competent to act in a national character and exercise self-government and while residing within their own territories owing no allegiance to State laws. (3 Kent's Comm. [3d ed.] 384.) Although they sold part of their lands they did not surrender their right of self-government on their Reservations.

It is clear that the Onondagas retained their right of self-government within their Reservation and this right has been recognized by the courts. "Their lands are reserved to them by their treaties with the state of New York. Their right of occupation is acknowledged and confirmed by treaty with the United States." (*Mulkins* v. *Snow,* 232 N. Y. 47, 50–51.) The Onondaga Nation is a quasi-foreign nation and its reservation is quasi-extraterritorial. "When the state of New York legislates in relation to their affairs, its action is subject to the paramount authority of the federal government." (*Mulkins* v. *Snow,* p. 51; *People ex rel. Ray* v. *Martin,* 294 N. Y. 61, 69; *St. Regis Tribe* v. *State of New York,* 5 N Y 2d 24, 38.)

Legislative power over Indian affairs is vested in Congress. "The Congress shall have Power * * * to regulate Commerce with foreign Nations * * * and with the Indian Tribes" (U. S. Const. art I, § 8, cl. 3; See, e.g., *Hallowell* v. *United States,* 221 U. S. 317; *Worcester* v. *Georgia,* 6 Pet. [31 U. S.] 515; *United States* v. *Kagama,* 118 U. S. 375; *United States* v. *Thomas,* 151 U. S. 577). There is no doubt that legislation implementing this constitutional mandate ousts State law on the same subject and to the extent that a State enactment

otherwise valid interferes with or impedes the operation of a Federally-created scheme to fulfill the obligation toward the Indians, the State law must fall. (*McCulloch* v. *Maryland, supra; Board of County Commrs.* v. *United States,* 308 U. S. 343.) Thus if any interference with the Federal program for the Indians can be shown to result from the taxes sought to be imposed, the taxes must be struck down and the judgment below affirmed.

Congress has established, within the Department of the Interior, a specific body known as the Indian Arts and Crafts Board (U. S. Code, tit. 25, § 305) " to promote the economic welfare of the Indian tribes and the Indian wards of the Government through the development of Indian arts and crafts and the expansion of the market for the products of Indian art and craftsmanship." (U. S. Code, tit. 25, § 305a.)

Although the right of the State to tax the income of an Onondaga Indian earned off the Reservation has been upheld (*Matter of Powless* v. *State Tax Comm.,* 22 A D 2d 746, affd. 16 N Y 2d 946, cert. den. 383 U. S. 911) there is no authority for taxing sales of artifacts made and sold on the Reservation by members of the Onondaga Nation. Where, as in this case, such a tax would frustrate the evident Congressional purpose that no burden shall be imposed on the development of Indian arts and crafts and the expansion of the market for products of such development (U. S. Code, tit. 25, §§ 305, 305a) it cannot be upheld. In *Warren Trading Post* v. *Tax Comm.* (380 U. S. 685, 690–691) the court, in holding that the collection of a 2% tax on gross proceeds of sales could not be assessed and collected on sales from trading with reservation Indians on the reservation, said: " We think the assessment and collection of this tax would to a substantial extent frustrate the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations except as authorized by Acts of Congress or by valid regulations promulgated under those Acts. This state tax on gross income would put financial burdens on appellant or the Indians with whom it deals in addition to those Congress or the tribes have prescribed ".

The Congressional purpose of promoting the welfare of the Indians by development of their arts and crafts, and the marketing of their products is demonstrated by the provisions of law (U. S. Code, tit. 25, § 305a) relating to market and technical research, technical advice and assistance, experimentation, correlation, and encouragement of activities, financing, standards, regulations, use of trade-marks, and registration thereof.

In this case Congressional regulation of trading in Indian artifacts is so comprehensive that there is no room for the State to burden such trading by taxation. The order of Special Term should, therefore, be affirmed.

BASTOW, J. P., GOLDMAN, DEL VECCHIO and MARSH, JJ., concur.

Order unanimously affirmed, without costs.