In the Matter of COUNTY OF BROOME et al., Respondents-Appellants, v MARIO M. CUOMO, as Governor of the State of New York, Appellant-Respondent.

Third Department, June 21, 1984

APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General* (*Lew A. Millenbach* and *William J. Kogan* of counsel), for appellant-respondent.

*Hancock & Estabrook* (*David E. Peebles* of counsel), for respondents-appellants.

OPINION OF THE COURT

CASEY, J.

 The central issue on this appeal is whether the State is compelled, pursuant to section 10 of the State Law, to provide counsel for petitioners' defense in certain actions commenced against them in Federal District Court by various Indian tribes claiming title and possessory rights with respect to certain real property. We agree with Special Term that section 10 of the State Law is applicable to two of the underlying Federal court actions.

Petitioners are 12 up-State counties named as defendants in one or more of three Federal court actions commenced by several Indian tribes claiming that certain lands owned by petitioners had been wrongfully obtained from the Indian tribes by the State of New York, petitioners' predecessor in title. Section 10 of the State Law provides: "The governor shall, at the expense of the state, employ counsel and provide for the defense of any action or proceeding, instituted against the state, or against any person deriving title therefrom, to recover any lands within the state, under pretence of any claim inconsistent with its sovereignty and jurisdiction."

The State maintains that the statute must be construed narrowly, and that the obligation to provide a defense arises only in those cases where the State's sovereignty and jurisdiction over the lands sought to be recovered are

directly challenged. Thus, the State concludes, since the gravamen of the three Federal court actions relate to title and possessory rights to the land in question, as distinguished from the State's sovereignty and jurisdiction over that land, section 10 of the State Law is inapplicable. While the pleadings of the Indian tribes in the underlying actions relate to title and possessory rights to the land, the basic claim in each action is that the State lacked the authority to enter into the treaties which purported to extinguish the title and possessory rights of the Indian tribes in the lands at issue. The State, however, argues that a claim asserting the invalidity of historical sovereign acts of the State is insufficient to invoke the provisions of section 10 of the State Law in the absence of a direct challenge to the State's "sovereignty and jurisdiction", apparently referring to the State's current authority to exercise any of its sovereign powers over the disputed land. We find no basis for this narrow, strained construction of the statute as applied to the facts and circumstances herein.*

Rather than being narrow and limited, the statute encompasses *"any* action * * * to recover *any* lands within the state, under pretence of *any claim inconsistent* with [the State's] sovereignty and jurisdiction" (State Law, § 10; emphasis added). It is difficult, if not impossible, to articulate a concise yet complete definition of sovereignty, since reference to its many attributes is often necessary (see *Snapp & Son v Puerto Rico,* 458 US 592, 601), but generally speaking it encompasses the State's power to manage its own affairs (see *Madden v Kentucky,* 309 US 83, 93). Among its attributes are the power of taxation (*McCulloch v Maryland,* 4 Wheat [17 US] 316, 428-429) and the power to create and enforce a legal code, both civil and criminal (*Snapp & Son v Puerto Rico, supra,* p 601).

By the treaty which concluded the Revolutionary War, all powers of government and right to the soil, including lands occupied by Indians, which had previously been in Great Britain, passed to the States (*Johnson v McIntosh,* 8

---

* There is no need to defer to any administrative expertise in construing this statute (see *Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459), but were we required to do so, we would nevertheless find the construction advanced by the State to be irrational.

Wheat [21 US] 543, 584). "But when the national government was formed, some of the attributes of State sovereignty were partially, and others wholly, surrendered and vested in the United States. Over the subjects thus surrendered the sovereignty of the States ceased to extend." (*Tennessee v Davis,* 100 US 257, 266-267.) The right to extinguish Indian title is an attribute that was so surrendered by the States (*Joint Tribal Council of Passamaquoddy Tribe v Morton,* 528 F2d 370, 376, n 6, citing *Oneida Indian Nation v County of Oneida,* 414 US 661, 667, 670). In the *Oneida Indian Nation* case (*supra,* pp 667-670), the court explained:

"It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign — first the discovering European nation and later the original States and the United States — a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States. The Federal Government took early steps to deal with the Indians through treaty, the principal purpose often being to recognize and guarantee the rights of Indians to specified areas of land. This the United States did with respect to the various New York Indian tribes, including the Oneidas. The United States also asserted the primacy of federal law in the first Nonintercourse Act passed in 1790 * * * which provided that 'no sale of lands made by any Indians * * * within the United States, shall be valid to any person * * * or to any state * * * unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.' This has remained the policy of the United States to this day * * *

"The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, including the

original 13. It is true that the United States never held fee title to the Indian lands in the original States as it did to almost all the rest of the continental United States and that fee title to Indian lands in these States, or the preemptive right to purchase from the Indians, was in the State * * * But this reality did not alter the doctrine that federal law, treaties, and statutes protected Indian occupancy and that its termination was exclusively the province of federal law."

From the foregoing, it is readily apparent that the power to enter into treaties to extinguish Indian title and possessory rights in their aboriginal lands is an attribute of sovereignty. Thus, the underlying actions, asserting that the State had surrendered this attribute and had acted without the consent of the United States, are under pretense of a claim inconsistent with State sovereignty and jurisdiction. Moreover, if the Indian tribes succeed in their actions to recover the lands at issue and those lands revert to their status as lands subject to aboriginal Indian rights, other attributes of State sovereignty, such as the power of taxation, may be restricted (see, e.g., *Pierce v State Tax Comm.*, 29 AD2d 124), further establishing that the claim in the underlying actions is inconsistent with the State's sovereignty. Accordingly, that portion of Special Term's judgment directing compliance with section 10 of the State Law must be affirmed.

■ The statute expressly refers only to actions to recover lands. Since one of the underlying actions by the Indian tribes is for money damages only, the statute, by its own clear and unambiguous terms, is inapplicable to that action. Thus, we are in agreement with Special Term that section 10 of the State Law applies only to two of the underlying actions.

■ We also reject petitioners' claim that Special Term erred in failing to direct respondent to engage the law firm currently defending petitioners in the two actions subject to section 10 of the State Law. The statute vests in respondent, not petitioners, the choice of counsel to be employed. Petitioners' claim that a conflict of interest bars the Attorney-General from defending them in the underlying ac-

tions is premature, since respondent has not yet made his choice.

■ Finally, we conclude that Special Term erred in awarding petitioners the amount of legal fees incurred in defense of the two underlying actions subsequent to May 13, 1982, the date petitioners demanded that respondent comply with section 10 of the State Law. In our view, such relief was not merely incidental to the CPLR article 78 relief sought, but rather, constituted a separate and distinct claim for monetary damages that must be brought in the Court of Claims (see *Matter of Dubner v Ambach*, 74 AD2d 949, 951 [Mahoney, P. J., concurring], affd 52 NY2d 910).

The judgment should be modified, on the law, without costs, by deleting so much thereof as directed respondent to reimburse petitioners for legal fees incurred subsequent to May 13, 1982, and, as so modified, affirmed.

MAIN, J. P., MIKOLL, YESAWICH, JR., and HARVEY, JJ., concur.

Judgment modified, on the law, without costs, by deleting so much thereof as directed respondent to reimburse petitioners for legal fees incurred subsequent to May 13, 1982, and, as so modified, affirmed.